AXELRAD, J.T.C.
This matter involves appeals for the 1995 and 1996 tax years by both B.F. Goodrich Company (the “taxpayer”) and Oldmans Township (the “municipality”) of the local property tax assessment of the B.F. Goodrich facility located on a 6.94 acre tract in an I-Industrial Zone and designated as Block 38, Lot 12.02 in Oldmans Township, Salem County, New Jersey. The subject site had been part of a larger tract of 102.92 acres, which taxpayer owned and upon which it operated a single facility with various processes. In early 1994 the property was sub-divided and most of the land and operation was transferred to Geon, a former division of taxpayer that was spun-off as a separate entity, with taxpayer retaining the more profitable latex operation which is the subject of this appeal.
*117 The property is improved with a 35,000 square foot multi-story latex manufacturing and warehouse building originally constructed in 1969, with additions in 1982, 1988, and 1994; a 1,500 square foot, one-story accessory office building constructed in 1986; and miscellaneous site improvements and tanks. The parcel has limited road frontage along Porcupine Road with its southern boundary formed by the main Conrail rail line. Parking and entry to the site is obtained through the neighboring Geon property. The property has utility and rail services with electric and steam obtained from the cogeneration plant located adjacent to the subject property. Water and sewer service is supplied to taxpayer from Geon’s on-site well and treatment facilities pursuant to a private agreement with Geon.
The subject property was assessed for both tax years at $1,496,-700. The relevant common level ratios of assessment to true value of the Director of the Division of Taxation for Oldmans Township pursuant to N.J.S.A. 54:1-35.1, commonly known as “Chapter 123”, are 93.86% and 91.19% for the 1995 and 1996 tax years, respectively, indicating equalized true values of $1,594,600 and $1,641,300. Taxpayer’s appraiser, Anthony Rinaldi, concluded a fair market value of $1,260,000 as of October 1, 1994 and $1,200,-000 as of October 1, 1995. The conclusion of municipality’s appraisers, Michael Buehalski and Joseph Novelli, was $4,545,000 and $4,635,000 for 1995 and 1996, respectively.
Both parties’ experts agreed that the highest and best use of the subject property is its current use as a latex manufacturing plant. The experts used the reproduction cost approach to determine the value of the improvements and the sales comparison approach to determine the land value of the subject site.
The cost approach is a method by which an appraiser derives a value indication by estimating the current cost to reproduce or replace the existing structure, deducting all accrued depreciation in the property and adding the estimated land value, to arrive at an indicated value of the property. Appraisal Institute, The Dictionary of Real Estate Appraisal 81 (3d ed.1993). The experts utilized the segregated and quantity survey methods, *118 relying upon the Marshall Valuation Service Manual and the Means Cost Assemblies Manual to arrive at a total reproduction cost estimate of each component, taking into consideration an analysis of contingency costs, direct or hard costs, indirect or soft costs, entrepreneurial profit, and physical depreciation, functional and economic/externai obsolescence. Novelli was employed by the municipality to perform a line-item analysis of the building and yard improvements to determine their reproduction cost new.

October 1, 1994 valuation date for the tax year 1995:

IMPROVEMENTS

Building 502, Latex manufacturing:

Reproduction Cost New

Initially the experts were only $220,000 apart in their estimates of the hard costs of the latex manufacturing budding, with the bulk of the difference being in the structural components. Cross-examination disclosed that an associate of unknown credentials in Rinaldi’s office had performed most of the site inspection and preparation of the cost analysis, relying primarily upon the appraisal reports prepared by municipality’s experts in connection with the Geon appeals for prior years, which were settled. During a break in his testimony, Rinaldi re-inspected the property and reviewed the building plans for the first time. Taxpayer’s counsel attempted to submit an amended expert report, seeking to correct the errors that had been brought out in cross-examination. The report which was submitted to the court and upon which Rinaldi testified on direct, did not reference, and did not appear to include, the cost of the components of the 1994 addition that comprised roughly 11% of the total building area. Rinaldi’s subsequent testimony on cross-examination and re-direct brought him more in line with the estimated hard costs of municipality’s experts, but it was apparent to the court that he had backed into most of his numbers in an attempt to minimize the damage that had been done to his credibility during the first two days of cross-examination. The court recognizes that estimating the reproduction cost new is not an exact science and would have expected *119 there to be some difference in the experts’ bottom line building costs. The record is replete, however, with examples of Rinaldi’s incomplete review of building plans and overall lack of preparation, glaring errors in his report, short-cutting the field work and costing process by relying upon a staff member who appeared to have copied portions of the report prepared by municipality’s experts prior to the construction of the 1994 addition, and deficiencies in substantiating many of his conclusions. These flaws pervaded his entire testimony and clearly impacted negatively on his credibility and expertise.
On the other hand, Novelli candidly acknowledged that although the as-built plans which he reviewed showed tile tank liners in the four concrete blend tanks on the north wall of the plant, he was willing to accept the testimony of taxpayer’s Plant Manager, Ron Szmerda, that the liners were not actually used, and had at his fingertips a quantification of the $60,000 cost he had attributed to the liners. Furthermore, both of municipality’s experts fully inspected the facility on numerous occasions, examined voluminous detailed building and site plans, and submitted a comprehensive report which supported their conclusions. After deducting the cost of the tile tank liners and sales tax from the non-structural costs, Novelli estimated the total hard costs of the latex manufacturing building at $2,581,595, comprised of $1,459,799 structural and $1,121,796 non-structural.[1] Although Rinaldi’s amended hard costs were only $27,000 less, based upon the court’s assessment of the credibility and expertise of the appraisers, the court finds the estimate of municipality’s experts to be more accurate.
A contingency factor is then added to these hard costs to represent changes from conceptual stage to final stage of the project. Rinaldi demonstrated a misunderstanding of the basic premise of the cost approach which estimates the cost of reproducing the existing structure, when he testified that since the building *120 was already constructed and plans were available, there are no contingencies. He did, however, include a “token” 1% for miscellaneous hard costs in his report which he testified could encompass something unforeseen.
Novelli applied a 5% contingency to the hard costs, acknowledging that the amount was a “judgment call” but soundly founded upon his experience as an estimator and contractor and the Means Construction Cost Manual, which indicated a range of 2% based on final working drawings to 15% based on an allowance at the conceptual stage. He testified that an allowance was necessary for modifications made in the field and that a 5% contingency was appropriate because the property evolved as it was built, including several additions, and was a multi-level, manufacturing building that would require modifications from the conceptual plans. Taxpayer’s rebuttal witness, Phillip Waier, the principal engineer of R.S. Means Company and senior editor of the Building Construction Cost Data Book, who never visited the property, testified that a contingency was not necessary because a contractor could go to this site and quantify what appears, although he acknowledged that the Manual did identify the potential costs and range cited by Novelli. The theoretical nature of Waier’s testimony and the lack of relevance to this particular facility were underscored by the fact that taxpayer itself had allocated a figure for a contingency in its cost estimate of the 1994 addition to the subject building, as reflected on the printout introduced into evidence during Waier’s cross-examination. Although the amount of taxpayer’s projected contingency was deemed inadmissable, it is clear that this is the type of cost anticipated in the marketplace for construction of this kind of facility. The 5% figure employed by municipality’s experts is an appropriate charge, within the range suggested by the Means Manual and reasonable under the circumstances in which this building was constructed.
The balance of the direct or hard costs include general conditions and overhead and profit. The general conditions relate to costs incurred by either the general contractor or property owner for items associated "with job management and supervision of the *121 construction. Taxpayer’s expert used 7% based on his experience that a one year construction job would cost $15,000 per month, while municipality’s expert used 10% as being the “most typical” recognized by the Means Assemblies Cost Manual and within the 5%-15% range therein. The court finds there was insufficient explanation and quantification by taxpayer’s expert to justify his deviation from the “typical figure” and, as such, a 10% figure will be accepted for general conditions. Both parties’ experts used a figure of 10% for overhead and profit of the general contractor and various subcontractors.
Soft or indirect costs are then added to cover other expenditures, such as administrative costs, professional fees, financing, and interest paid on loans, as well as property taxes and liability insurance during the construction. Taxpayer’s expert uses 10.5% total, comprised of 5% arehitecVengineering fees; 2% miscellaneous, including permits, fees and real estate taxes; and 3.5% interest on construction loans. Municipality’s expert uses 19.5% total, comprised of 7% architect/engineering fees; 4% miscellaneous (2% insurance and bonding costs and 2% permits and environmental costs) and 8.5% interest on construction loans. Municipality’s experts based their estimate of professional fees on the higher end of the range contained in the Means Manual (architects 5.75% and engineers 1.25%) because a multi-level facility built in stages would be more difficult to design and construct. As Rinaldi’s figure was based solely on his “experience and talking to architects over the years,” without any quantification or substantiation for his net opinion, the court finds the 7% estimate of municipality’s experts to be more appropriate, as it is substantiated by the objective data in the Means Manual and special features and configuration of the chemical plant.
The court accepts Waier’s testimony that insurance and bonding costs are generally intended to be included in overhead and profit, which is consistent with the charts in the Means Manual. Thus, the 2% which municipality’s appraisers included as an additional miscellaneous cost will be disregarded and the court will utilize a total of 2% for miscellaneous costs.
*122 The court does not agree entirely with Buchalski’s conclusion that all money would be borrowed up front for a one year construction project since construction loans are frequently advanced as construction progresses. His theory, however, is more realistic than Rinaldi’s analysis which assumes the owner would use half of his own funds and only borrow half. Rinaldi’s analysis is inconsistent with the reality of the market place. In fact, the owner would most likely borrow as much as he could since there would be no benefit of having equity in this type of project. As between the two experts, whose opinions are the only evidence available on the record, the court finds Buchalski’s methodology to be more appropriate in estimating the proper interest rate for the construction of this facility. Since there was no testimony by taxpayer’s expert as to the amount of interest an owner could receive as an offset against the loan if it placed all of the proceeds into short term investments and drew the funds down over the course of the year, the court accepts Buehalski’s conclusion of 8.5% construction interest.
Taxpayer’s expert included the interest on real estate taxes on land as part of the miscellaneous soft costs while municipality’s expert added $25,100 (.416% of the total cost). The court finds the total soft cost of 17.5% is sufficient to encompass the minimal interest on real estate taxes on the land and, thus, will not include them as a separate cost.
Entrepreneurial profit is compensation for risk and expertise associated with development. If appropriate, it is included as an additional cost to arrive at the total reproduction cost new prior to depreciation.
Proper use of the cost approach requires, not a mechanical addition of 10% for entrepreneurial profit, but a critical analysis of the property in its market on the appraisal date to determine whether cost should be adjusted upward or downward and to take account of market conditions. The task is to ascertain whether the market will pay more or less than replacement cost for new construction of the kind being valued, to quantify the difference and to adjust accordingly. [Texas Eastern Transmission Corp. v. East Amwell Tp., 13 N.J.Tax 24, 41 (Tax 1992).]
Rinaldi’s explanation that solely because the subject facility was not built for rental or resale but rather for use by the owner, there *123 is no basis for entrepreneurial profit, falls wide of the mark. Municipality, however, did not present sufficient proofs in this case for the court to draw the inference that the market would recognize a profit for a developer of this property based on reasonable estimate of profit that entrepreneurs would expect in development of similar projects. Sears, Roebuck & Co. v. Rockaway Tp., 12 N.J. Tax 381, 390 (Tax 1992). There was no market data demonstrating that entrepreneurial profit should be included as an additional cost in this case. As such, entrepreneurial profit will not be considered in valuing the subject property.

Physical Depreciation

Depreciation, or loss in value, is caused by physical deterioration, functional obsolescence, and external or economic obsolescence. Both parties’ experts agreed that the subject property was in above average condition and quite well maintained. Taxpayer’s expert attributed an average useful life of fifty years for the structural components while municipality’s expert estimated sixty years and both estimated twenty five years for the non-structural components. The actual chronological age of the manufacturing building is fifteen years. In attributing an effective age of twenty years to the structural components and seventeen years to the non-structural components, taxpayer’s expert concluded physical depreciation of 40% and 68%, respectively, based upon the use of the building as a chemical plant. Municipality’s experts estimated a fifteen year effective age for the structural and a ten year effective age for the non-structural components, concluding physical depreciation of 25% and 40%, respectively. Buchalski projected a shorter effective age and longer useful life due to the additions in 1982, 1988 and 1994, and the significant maintenance program attested to by taxpayer’s plant manager. It appears that Rinaldi was not aware that the property had been improved with a two-story addition of nearly 4,000 square feet in 1994, including new wiring, an HVAC system and other short-lived items, when he prepared his appraisal report, which may account, to some extent, for his higher estimate of depreciation. Based on the building’s additions and renovations, most notably the most recent *124 one which is proximate to the valuation date, and the over-all condition and maintenance of the plant, the court accepts Buchalski’s estimate and concludes a resultant physical depreciation of 25% for the structural components and 40% for the non-structural components.

Building 506, Office:

The office was constructed in 1986 with some renovations in 1994. Neither expert testified as to the specific components of this building. In his report Novelli estimated a total hard cost of $117,442, comprised of $38,667 for structural components and $78,775 for non-structural components. Since Rinaldi’s figure was $1,610 higher and the court finds municipality’s experts to be more credible, the court accepts Novelli’s number. The reasoning and conclusions of the court regarding the total reproduction, direct and indirect costs, and lack of entrepreneurial profit, applied to the manufacturing building, are incorporated herein.
The experts used the same average useful lives for each of the components as they used for the latex manufacturing building. In attributing an effective age of seven years to both components, taxpayer’s expert depreciated the structural items by 14% and the non-structural items by 28%. Municipality’s expert testified that the renovations were minor and primarily cosmetic in nature, and thus used the eight year chronological age of the building as the effective age of both components, thereby depreciating the structural items by 13% and the non-structural items by 32%. The court accepts the latter expert’s rationale since he attributes a greater over-all depreciation to the office than does taxpayer’s expert, and will accept the resultant depreciation of 13% for the structural components and 32% for the non-structural components.

Yard Improvements:

The yard improvements are comprised of (a) paving, rail siding, fencing, utility buildings; (b) pipe racks/equipment foundations; (c) assorted kinds of underground and above ground piping; and (d) various tanks. Rinaldi initially estimated the reproduction cost new of the site construction improvements under the Marshall’s Valuation Manual at $237,960, which he depreciated by 60% based *125 upon an effective age of fifteen years and useful life of twenty five years, resulting in a depreciated total of $95,184. He then reinspected the property during a break in his cross-examination and added visible items which he initially neglected to value, such as fencing, the second set of rail siding, and the guardhouse and smokehouse, all of which had been included in municipality’s experts’ report. In his re-direct testimony he increased the total cost of site improvements to $499,060, which when depreciated at 60% would result in a depreciated cost of $199,624. Rinaldi’s testimony regarding these site improvements lacked credibility and, thus, will not be considered by the court. For example, rather than acknowledging the errors in his report, he made incredulous statements such as his comment that in his re-inspection during the break in his cross-examination, he “eyeballed the amount of site paving from the roof of the building” and determined there was only half the quantity he originally estimated, obviously in order to allow leeway for the other items he neglected to include so as to back into his revised numbers.
Municipality’s experts used the Means Cost Assemblies Manual to obtain the base unit costs of the site construction items of $380,289, exclusive of pipe racks/equipment foundations, to which were added sales tax, contingency, general conditions, overhead and profit, land interest and taxes, and entrepreneurial profit. A variety of ages and useful lives were assigned to the components based upon life expectancies obtained from the Marshall Valuation Service, resulting in the bulk being depreciated by 50%. The court accepts the Means unit prices and methodology utilized by municipality’s experts, but reaches a reproduction cost new of $584,740 because of its disallowance of the additional soft costs, land interest and taxes, and entrepreneurial profit. Since the entire facility is well maintained, the court finds that 50%, rather than 60%, is the appropriate depreciation for these categories of site paving, construction and utility buildings, and that it is unnecessary to segregate the railroad siding and depreciate it at a slightly lower rate. As such, the physically depreciated cost of these site construction items is $292,370.
*126 Rinaldi did not value any of the components of the pipe racks that circle the site and support roughly seventy five different above ground pipes, a variety of which transport raw materials, steam, and cooling water to the latex manufacturing building. These elevated, steel structures which are bolted in place with concrete footings were itemized by Novelli as pump foundations (piers and footings, concrete slabs on ground), pipe bents (spread footings), piers, steel framing, and hardware, along with the dikes and lighting, as components of the equipment foundations. The only explanation contained in Rinaldi’s report for his exclusion of these items was that “approximately 375 linear feet of the loop of pipe racks is situated on the B.F. Goodrich tax parcel, however since it is assessed on the Geon tax parcel, it is therefore not included in our appraisal.” After conceding on cross-examination that he never saw the property record card and had no factual basis for his assumption, Rinaldi then tried to justify the omission of the pipe racks and ancillary components as items which are excludable under the Business Retention Act, (the “Act”) L.1992, c. 24, § 3, N.J.S.A. 54:4-1:
Real property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the real property or an appurtenance thereto, unless:
(b) The personal property so affixed is machinery, apparatus, or equipment used or held for use in business and is neither a structure nor machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons or property. For purposes of this subsection, real property shall include pipe racks, and piping and, electrical wiring up to the point of connections with the machinery, apparatus, or equipment of a production process as defined in this section, (emphasis added).
He asserts that as the “foremost expert appraiser on the Business Retention Act,” he interprets the last sentence of subsection (b) of N.J.S.A. 54:4 — 1 as taxing pipe racks along with piping and electrical wiring only up to the point of connections of a production process.
The proper method of statutory construction which Rinaldi has overlooked is that “[p]unctuation is part of an act and may be considered in its interpretation.” Moore v. Magor Car Corp., 27 N.J. 82, 87, 141 A.2d 536 (1958), citing several New Jersey cases and Sutherland, Statutory Construction § 4939 (3d *127 ed. 1943). The words “pipe racks” stand alone and are separated from the balance of the sentence by a comma and a conjunction. Rinaldi’s interpretation is inconsistent with accepted rules of statutory construction and would expand the class of specific items excludable from taxation in violation of the intent of the legislature. “Where no contrary intention appears, qualifying words refer solely to the last antecedent.” In Re Burlington County Recycling Facility, 232 N.J.Super. 136, 141, 556 A.2d 807 (App. Div.1989) citing, 2A Sutherland, Statutory Construction § 47.33 at 245 (4th ed. 1984). Thus, the phrase “up to the point of connections with the machinery, apparatus or equipment of a production process” applies only to the immediately preceding clause “piping and electrical wiring.” Had the Legislature intended to impart broader significance to this sentence and provide additional exclusions from taxation, it would not have used the word “and” between “pipe racks” and “piping” and would have inserted a comma after the word “wiring.” Thus, based on the express language of the statute and rules of grammatical construction, it is clear that the qualifying phrase “up to the point of connections” was not intended to modify “pipe racks” as part of a series and was intended to apply solely to the immediately preceding phrase “piping and electrical wiring.” As such, pipe racks are expressly taxable under this Act. The court accepts Novelli’s conclusion of $98,519 as the unit price of the components under Means, but reaches a reproduction cost new of $151,485, due to the disallowance of certain expenses previously discussed in this court’s analysis of the reproduction cost new of the buildings. The 40% depreciation figure estimated by Buchalski is unrebutted and consistent with similar items; therefore, the physically depreciated cost of these items is $90,891.
In addition, Rinaldi’s report and direct testimony did not even mention any of the underground or above ground site piping improvements to the property. Novelli obtained measurements directly from the engineering plans and utilized the Means Cost Assemblies Manual to cost the underground fire loop, sanitary sewage piping and potable water at $74,951, as well as the outside process piping, cooling and demineralized water and steam, under *128 ground piping, and pipe coverings up to the meter in the manufacturing building at $562,088. After adding the hard and soft costs, he depreciated the piping by 40%, based on a twenty year effective age and a fifty year physical life for low maintenance, long-lived items. In his post-reinspection testimony, Rinaldi conceded that he missed the fireloop and sanitary piping, which were clearly taxable as real estate and arrived at a value under Marshalls of $73,400. Unlike municipality’s experts, however, Rinaldi did not view the schematic plans for either of these underground items but concluded the cost by measuring the perimeter of the building and estimating how far away the hydrants were for the fireloop and scaling the sewer line on the site plan based on where he had been told the line would be located.
Rinaldi took the position that none of the other piping and ancillary items should be valued as real estate improvements, even though they are located outside the latex manufacturing building. He claims they are a part of the production process after the first point of connection and, therefore, excludable from taxation under the Business Retention Act, L.1992, c. 24, § 3, N.J.S.A 54:4-1, although his report contains no reference to this statute or concept. Subsection (b) of N.J.SA 54:4-1 taxes as real estate “piping and electrical wiring up to the point of connections with the machinery, apparatus, or equipment of a production process ...” (emphasis added), which Rinaldi interprets as meaning first point of connections, which he claims starts at the well on the Geon property and the adjacent Pedricktown Cogeneration Plant because of the necessity for hot and chilled water for steam and cooling of the pipes that transport the chemicals to the manufacturing plant.
At the subject facility taxpayer converts raw materials to the intermediate product, liquid latex, which is sold to manufacturers for use in paint, adhesives, and textiles. Chemical vinyl chloride is delivered to the site in rail cars or trucks and unloaded into storage tanks on the tank farm. These chemicals, as well as steam, chilled water, and demineralized water are transported through pipes supported by the pipe rack system, which merge at *129 the flow meter station on the fourth floor of the latex building. Inside the building, the process of polymerization begins; the raw materials are vacuum pumped into refractory and reactor tanks on the third and fourth floors, where they are mixed with treated water. The tanks are then heated with steam then cooled with chilled water to produce the chemical reaction, and the product is piped into concrete and fiberglass blending and mixing tanks on the first floor, strained, and pumped out of the building to drums or tank trucks.
Buchalski’s testimony that the representatives of Geon, taxpayer and the municipality agreed to assess the pipes and racks based on their physical location on each of the respective parcels, was not disputed or contradicted in any way by taxpayer. He determined that the meter and pump on the building formed the “point of connection” with the machinery, apparatus, or equipment of the latex manufacturing process performed by taxpayer at this site and only valued the raw material piping and related components outside of the building. This conclusion was based first on site inspections and discussions with taxpayer’s and Geon’s plant managers about the details of the manufacturing process, and second on his interpretation of the Business Retention Act and the “permitted uses” of the zoning ordinance for “industrial plants whieh carry on processes within completely enclosed buildings
Taxpayer’s plant manager testified that the process begins at the tank farm. His conclusion was based upon the DEP requirement to take daily readings of the storage tanks to make certain there are no chemical spills when the raw materials are piped sequentially by a computer in the tank farm to the flow meter on the fourth floor of the latex building.
The court finds that, for purposes of the Business Retention Act, the process starts inside the manufacturing building and the point of connection is the meter on the fourth floor where the pipes merge and materials are introduced into the latex manufacturing reactors, tanks, and processing equipment. N.J.S.A. 54:4-1.15 and N.J.AC. 18:12-10.1 define “production process” as the *130 “process commencing with the introduction of raw materials or components into a systematic series of manufacturing, assembling, refining or processing operations and ceasing when the product is in the form in which it will be sold to the ultimate consumer.” Taxpayer’s operation involves the chemical processing of the raw materials of vinyl chloride and demineralized water, which are mixed together, heated and cooled in reactor tanks, piped to blender and mixing tanks and strained, all inside the manufacturing braiding, emerging in the intermediate form of liquid latex and shipped in drums or tank cars. In fact, since each component is transported from the storage tanks to the building in a separate pipe, it is clear that taxpayer does not want chemical reactions occurring prior to the time the raw materials enter the manufacturing plant and are sent into the reactors in regulated amounts and intervals. Taxpayer’s facility is not a water treatment plant. The demineralized, clarified, chilled, and heated water are raw materials in the process to the same extent as the chemicals; they are mixed with the chemicals, used to heat and cool the reactors so the polymerization can occur, and used in a variety of ways in the balance of the latex manufacturing process. Rinaldi’s insertion of the word “first” into the statute and his conclusion that the point of connection occurs off-site, defies law and logic and renders the Act meaningless, as no piping would ever be taxable as real property under his interpretation.
The court accepts Novelli’s estimate of the unit prices of the piping and ancillary items, but reaches a reproduction cost new of $979,526, due to the disallowance of certain expenses previously discussed herein. The 40% depreciation figure estimated by Buchalski is unrebutted and consistent with other yard improvements; therefore, the physically depreciated cost of the site piping up to the point of connection in the manufacturing building with the machinery, apparatus or equipment of the latex production process is $587,716.[2]
*131 The yard improvements also include three bolted steel tanks of 30,000 gallons, 52,000 gallons and 250,000 gallons, which were valued by both experts via the Marshall Valuation Service Manual, which includes direct, indirect, and soft costs in its reproduction cost figures.* *[3] Taxpayer’s expert estimated the replacement cost new of $183,500, depreciated the two smaller tanks at 60% (fifteen year effective age and twenty five year economic life), and the larger one at 40% (ten year effective age and twenty five year economic life) without explanation therefor, and concluded a depreciated total of $91,042. Municipality’s experts estimated the replacement cost new of $136,600, depreciated all tanks at 25% (ten year effective age and forty year economic life) and concluded a depreciated total of $102,450. Buchalski attributed a longer economic life to the tanks due to their constant cleaning after each use and overall high maintenance, which was corroborated by taxpayer’s plant manager. The court accepts the physically depreciated total of $102,450 presented by municipality’s experts as more probative, based on their overall credibility and basis for depreciation which was corroborated by taxpayer’s own witness.

Obsolescence of Facility

Taxpayer’s expert then deducted $527,485, approximately 36% of the depreciated reproduction cost, for the following items which he contends constitute functional obsolescence: diminished functional useful life, excess operating expense, and deferred asbestos removal. He asserted that the plant had a diminished useful *132 functional life and deducted $123,366, 12.5% of his estimate of physically depreciated costs of the structural components of the manufacturing plant, from its value. This was based upon taxpayer’s lease with Geon for utilities that expired in 2003, which, if not renewed, would require taxpayer to install new facilities; his estimate of the fifteen year overall remaining life of the existing reactors which would render the building substantially obsolete; and the limitation on the monthly consumption of underground water set by an outside agency he could not identify. BuchalsM did not find any diminished useful functional life of the facility based on these items. As of the appraisal dates, taxpayer was paying for utilities at a controlled cost under a long term services contract with renewal options. Furthermore, there was no evidence presented that the agreement would not continue on mutually agreeable terms. To the contrary, it appears that taxpayer expected to operate the latex manufacturing facility for a long period of time, particularly since taxpayer created the situation of the off-site utilities when it sub-divided the parcel and its expenditure of considerable sums of money for the renovations, additions, and new reactors.
BuchalsM further testified that the DEP regulation on ground water usage does not affect value as it is not site specific, but applies to a multitude of property owners throughout the State. In fact, the direct governmental limitation is imposed on Geon’s, not taxpayer’s, water usage. The cap was contractually allocated to taxpayer based on each party’s consumption at the time taxpayer formed Geon and carved out a separate tax parcel dependent on Geon for utilities. More importantly, considering the relationsMp of the parties and based on taxpayer’s plant manager’s own admission that taxpayer has been exceeding the 1,000 gallon per month water allocation imposed on it by Geon, it is reasonable to conclude that the limitation has not been, and is unlikely, to be strictly enforced by Geon in the future.
Rinaldi deducted approximately $360,000 for excess operating expense obsolescence because of the four story design of the plant which he claims requires additional time for material handling *133 because of elevator delays; the costs of repairs, maintenance, and monitoring of asbestos; and the salary for an additional employee and the cost of a tractor/trailer due to off-site warehouse facilities in Woodstown. These conclusions were disputed by taxpayer’s plant manager, who testified that other facilities which are two stories may be less costly to build but have no manufacturing process advantages and are no cheaper to operate. Furthermore, Buchalski testified that off-site warehousing is common, and although taxpayer’s plant manager indicated that it would be easier to store empty drums in a warehouse on site, both agreed that it would have no impact on the economy of operations and all associated costs could be passed on to the customer. In addition, Rinaldi acknowledged that there had been no removal of asbestos siding at any time and did not provide any evidence that its existence impacted on the value of the building, nor any back up to support his cost estimates for removal and disposal.
Municipality’s experts concluded that the property suffers from a de minimis functional obsolescence since parking and entry are afforded through the Geon parcel. Although it has not presented any major problems for the latex operation, a 5% factor was applied to the entire site to cover the cost of constructing a road from Porcupine Road to the site, constructing a parking lot, and relocating minor site improvements, if necessary. The court finds Buchalski’s explanations and conclusions well reasoned while Rinaldi’s estimated excess operating expenses were directly contradicted by taxpayer’s own plant manager. His deduction for the existence and removal of asbestos was highly speculative and based on a net opinion. As such, the court finds that 5% is an appropriate deduction for functional obsolescence.
Taxpayer’s expert deducted 15% for external obsolescence, as a result of the water consumption limitations imposed by Geon and a purported low demand for industrial space in the area based upon “conversations he had with local brokers”, while municipality’s expert found no external obsolescence. Taxpayer’s expert did not review any written studies or documents and did not take into account the levels of occupancy of the nearby industrial facilities, *134 such as the Pureland and Commodore 295 Industrial Parks and the Pedriektown and Keystone Cogeneration plants. Rinaldi’s explanation that he disregarded these facilities because they were not recent sales, is inadequate. In view of the court’s finding regarding the water allocation and the existence of numerous industrial properties located within five miles of the subject property, the court rejects Rinaldi’s claim of external obsolescence.

LAND VALUE

Taxpayer’s expert relied upon three sales of land in the neighboring area which were zoned residential and concluded an indicated value of the 6.94 acre parcel at $13,000 an acre. Municipality’s experts relied upon nine land sales in the same area which were zoned light industrial and concluded an indicated value of $45,000 an acre, rounded at $310,000 for the subject property. The subject facility is located in an Industrial Zone and both experts agreed that its highest and best use, as if vacant, is industrial and, as improved, is its current chemical process and warehouse use.
Zoning is most often the most basic criterion in selecting comparables. Sites zoned the same as the subject property are the most appropriate comparables. If sufficient sales in the same zoning category are not available, data from similar categories can be used after adjustments are made. As a general rule, the greater the dissimilarity between the subject and the comparables, the more potential there is for distortion and errors in sales comparison. Appraisal Institute, The Appraisal of Real Estate 325 (11th ed. 1996).
A person who buys residential property has a different purpose than one who buys industrial land. Residential land in rural Salem County is nominal in value and the residential zones contain land use requirements so different from industrial zones that the residential comparables are virtually useless as a basis for valuing the subject site. Taxpayer’s appraiser attempted to overcome this deficiency by a 20% upward adjustment of the sales. Such adjustment, which was not based on any market study or property analysis, does not negate the significant differences in the zones, which in this case precludes comparability of residential land sales with the subject chemical manufacturing facility. National Westminster Bank NJ v. City of Brigantine, 11 N.J. Tax 502 (Tax *135 1991). Therefore, based upon the total lack of comparability of taxpayer’s sales and the fact that the record fails to demonstrate any error in Buchalski’s sales adjustments, the court finds that the value of the subject land is $45,000 an acre.
October 1, 1995 valuation date for the tax year 1996:
Both experts trended up the reproduction cost new figures from the prior year: 2.416% by taxpayer’s expert and 1.0215% by municipality’s experts. Rinaldi increased his soft costs from 10.5% to 10.75%, added one year to the physical age of each component for physical depreciation and asserted the same functional and economic obsolescence as the prior year while Buchalski retained the same figures for both years. Rinaldi did not provide any explanation for his increase while Buchalski derived his figure by averaging the July 1994 and 1995 historical cost indices contained in the Means Cost Assemblies Manual and comparing it to the January 1, 1996 number. The court is not convinced that either figure is accurate because there was no objective market data to reflect an increase in value. As such, the court will utilize the same market value for both tax years.
Based upon the evidence presented, the court arrives at an indicated value derived from the cost approach as follows:
Hard Costs
* RCN-
Phys Depreciation
Pep. Cost

Buildings:

502 Latex mfg. building $2,581,595: Structural Component $1,459,799 $2,179,243 25% $1,634,432
Non-structural Component 1,121,796 1,674,659 40% 1,004,795
506 Office building $ 117,442:
Structural Component $ 38,667 $ 57,724 13% 50,220
Non-structural Component 78,775 117,598 32% 79,967
TOTAL BUILDINGS $2,769,414
“ Includes 5% contingency, 10% general conditions, 10% overhead & profit, 17.5% soft cost (7% architect/engineermg fees, 2% miscellaneous and 8.5% interest on construction)

Yard Improvements.

Paving, rail, fencing, utility bldgs 380,289 $ 584,740 50% 292,370
Pipe racks/equip.foundations 98,519 151.485 40% 90,891
Piping 562,088 979,526 40% 587,716
Steel Tanks x* 136,600 136,600 25% 102,450
TOTAL YARD IMPROVEMENTS $1,073,427
* x Valued under Marshall’s which includes hard and soft costs in unit price
*136 PHYSICALLY DEPRECIATED COST OF SITE IMPROVEMENTS $3,842,841
Less 595 functional obsolescence - 192,278
IMPROVEMENT VALUE $3,650,563
LAND VALUE + 310,000
TOTAL MARKET VALUE $3,960,563
As the subject property’s market value of $3,960,563 falls well outside the Chapter 123 limits for both tax years, the assessments must be calculated by multiplying the indicated value by the Director’s ratio (93.86% and 91.19%). As such, the court will direct the entry of judgments increasing the assessments for the 1995 and 1996 tax years as follows:
1995: Land $ 290,966
Improvements 3,426,418
Total $3,717,384
1996: Land $ 282,689
Improvements 3,328,948
Total $3,611,637

 Structural components include foundation, superstructure, exterior closure, and roof while non-structural components include interior construction, conveyances, mechanical, and electrical systems.

 On July 21, 1997, subsequent to the conclusion of trial in this matter, our Supreme Court decided the case of General Motors Corp. v. City of Linden, 150 *131 N.J. 522, 696 A.2d 683, which essentially held that if an item of machinery, apparatus or equipment was taxable under the (a) test of the Business Retention Act, supra, it could not be excluded from taxation under the (b) test. This was not an issue raised during trial nor in response to the GM decision. As the case herein involved items which were sought to be taxable under section (b), the GM decision is inapplicable.

 The concrete blend mnks that formed part of the superstructure of the manufacturing plant were valued by both experts as structural components of the building. The storage tanks at the tank farm which are under 30,000 gallons and the eight fiberglass blend tanks placed in the manufacturing building in 1988 and 1995 were not valued as real estate by either expert.