KUSKIN, J.T.C.
Plaintiff has appealed the 1998, 1999, 2000, 2001 and 2002 property tax assessments on its property in the Borough of Union Beach. Defendant filed a counterclaim for each year except 1999. The property is designated on defendant’s tax map as Block 247, Lots 12 and 24 and is commonly known as 1515 Highway 36. For each of the years under appeal the assessment on the property was in the total amount of $23,261,600. The applicable average ratios under Chapter 123, N.J.S.A. 54:l-35a to -35c, were as follows:
*407 1998 -105.91
1999 -106.59
2000 -102.40
2001- 95.38
2002- 88.85
Plaintiffs appraiser determined a value for the subject property of $8,620,800 for each year under appeal. Defendant’s appraiser determined a value of $29,500,000 for tax year 1998, $30,500,000 for 1999, $31,300,000 for 2000, $34,000,000 for 2001, and $34,500,000 for 2002.
Defendant moved to dismiss plaintiffs appeals at the end of plaintiffs case, and I denied the motion. Consequently, I must now weigh and evaluate the evidence and decide the appeals on the merits. Specifically, I must determine whether either plaintiff or defendant demonstrated by a preponderance of the evidence that, for any year under appeal, the value of the subject property was such as to warrant an adjustment in the assessment.[1]
I.

Summary

The subject property is used by the plaintiff as a research and development facility. Both parties presented three approaches to value. Plaintiffs appraiser relied primarily on the sales comparison approach, secondarily on the income approach, and gave little weight to the cost approach. Defendant’s appraiser relied primarily on the cost approach, used the income approach as a check on the cost approach, and gave little weight to the sales comparison approach. As discussed in detail below, I reject the entire valuation analysis by plaintiffs appraiser because in each of his approaches: (1) he failed to make an adequate study of, or give *408 adequate consideration to, the defining characteristics of the subject improvements, namely, forty laboratories, three pilot plants, extensive utility services, a sensory testing center, and a biofilter unit; (2) he failed to analyze his comparable sales or leases in terms of such characteristics (most of which were either totally or largely absent from the comparables); (3) because of the self-imposed limitations on his analysis, he could not properly adjust his comparable sales or leases; and (4) the appraiser used replacement cost in his cost approach without determining or defining the design or components of the hypothetical replacement facility.
As also discussed in detail below, I reject the sales comparison approach by defendant’s appraiser as a valuation indicator because of his acknowledged inability to make reliable adjustments, and I use the approach only as suggesting a broad range of value for the subject property. I reject the appraiser’s income approach for tax years 1998,1999 and 2000 because of the absence of truly comparable leases, the appraiser’s limited knowledge of some compara-bles, and the appraiser’s acknowledged difficulty in making adjustments. For tax years 2001 and 2002,1 give the appraiser’s income approach limited weight because his comparable leases are more rehable than those he used for the earlier years, but the difficulty in making adjustments remains. I accept and rely on the cost approach analysis by defendant’s appraiser, with certain corrections, because: (1) the analysis was based on a thorough quantity survey of the components of the subject improvements, performed by a cost estimator who made a detailed, extensive study of construction plans; (2) the percentage amounts used by the appraiser for factors such as contingencies, general conditions, and soft costs were reasonable and well supported; and (3) the appraiser’s depreciation analysis was reasonable and more reliable than that of plaintiffs appraiser.
In relying on the cost approach presented by defendant’s appraiser, I recognize and accept that a market exists for the subject property. Even in these circumstances, I regard the cost approach as usable because it is a market approach and reflects market value. In addition, based on the proofs presented, defen *409 dant’s cost approach is the only reliable indicator of the subject property’s value.
II.

The Subject Property

The subject land contains 20.58 acres, generally level, with a small amount of wetlands and all public utilities available. The wetlands do not impair the use or utility of the property. The property is located in the M-2 — Heavy Industrial Zone which permits, among other uses: research and testing laboratories; manufacturing of light machinery; fabrication of metal, wood and paper products; and other manufacturing. The maximum building coverage permitted in the zone is 35%, and the minimum unoccupied space is 20%. Accordingly, 80% of lot area may be covered with buildings, parking lots, and other site improvements.
The main building on the property is part one, part two, and part three stories. It covers 12% of the site, and 40% of the site is improved, including the main building, other buildings, and parking and driveway areas. The original construction of the building was in 1967. Additional construction took place during the 1970’s, 1985, 1993, 1995 and 1998. The property also includes a warehouse and garage building and miscellaneous outbuildings.
In determining the area of the buildings, a matter on which the two appraisers did not agree, I rely on the measurements of defendant’s appraiser because I find that he made a more careful examination of the building plans than plaintiffs appraiser. Defendant’s appraiser determined that the main building contains 175,501 square feet, including an odor emission control facility, known as a Bioton, containing 1736 square feet and excluding a 2160 square foot addition to the portion of the building known as the sensory testing center. As discussed below, this addition is includible in building area only for tax years 2000, 2001, and 2002. The warehouse and garage building contains 5000 square feet and the miscellaneous outbuildings contain 1356 square feet in the aggregate. Total building area, therefore, is 181,857 square feet *410 without the sensory testing center addition, and 184,017 square feet with the addition.
The breakdown of space in the main building is important to an understanding of the nature and character of the facility. Plaintiffs appraiser provided a detailed area computation for individual rooms, corridors, and stairwells. Defendant’s appraiser divided the building into discrete areas and included in each area, (i) the space specifically used for the primary function of the area, such as, laboratory, pilot plant or data center, and (ii) the additional space used in support of, or in connection with, the primary function. This additional space consisted of service corridors, offices, conference rooms, library, mechanical rooms, and storage areas. For purposes of understanding the building, the approach of defendant’s appraiser is more helpful and closer to how I believe the market would understand and view the property. The main building included the following sections or areas as described by defendant’s appraiser:
1) a laboratory area containing 93,704 square feet. This area includes forty-laboratories, twenty-three on the first floor and seventeen on the second floor. The laboratories are divided into analytical laboratories, delivery system laboratories, flavors laboratories, and natural products technology laboratories. Each laboratory has concrete block walls, no windows, a linoleum or concrete floor, and an exhaust system with a ducting hood. Different ductwork filtration is required for different chemicals, and thus the duet hoods in the laboratories are not identical. Each laboratory contains countertops with cabinets above and below, a refrigerator and freezer, and heavy duty electrical outlets. The laboratory area also includes offices within the laboratories, separate offices outside the laboratories, mechanical rooms, service corridors, and a library. The service corridors contain piping for various gases and other materials provided to the laboratories, including nitrogen, helium, hydrogen, hot water, cold water, salt water, compressed air, and steam;
2) a pilot plant area containing a total of 32,056 square feet, consisting of a fragrance pilot plant, flavor pilot plant, flavor chemical production area, and related offices. The pilot plants are used to produce small quantities of products using flavors and fragrances developed in the laboratories. The aggregate area of the laboratories, pilot plants, service corridors, and related mechanical rooms, offices and library is 125,760 square feet or approximately 72% of the total building area;
3) a data center containing 43,361 square feet including offices and conference rooms. The offices are generally concrete block, with dropped ceilings. The data center area also includes a 4182 square foot sensory testing center which was expanded by 2160 square feet to 6342 square feet sometime in late 1998. The sensory testing center has numerous cubicles used for individuals to test *411 flavors and fragrances. Approximately 39,000 people per year participate in these testing operations. The sensory testing center has ventilating and exhaust systems separate from, and of greater capacity than, the systems serving the offices;
4) two greenhouses and a potting shod, with an aggregate area of 4644 square feet; and
5) a biofilter unit (the Bioton) containing 1736 square feet.
Plaintiff contends that the Bioton and addition to the sensory testing center are non-assessable personal property. The statute governing when personal property is assessable is N.J.S.A. 54:4-1, which provides that taxable real property “includes personal property affixed to the real property” unless it satisfies one or the other of the two tests set forth in the statute, commonly known as the a and b tests. The statute and its operation are discussed in detail in General Motors Corp. v. Linden, 20 N.J.Tax 242, 264-69 (Tax 2002). The following analysis is based on that discussion.
The first issue under the statute is whether the personal property is affixed to the real property. I conclude that both the Bioton and sensory testing center addition are affixed. The Bioton has metal panel walls and is constructed on a concrete foundation. It is connected to exhaust ducts from the laboratories in the subject building and is connected to electric, water, and steam services. It has a separate uninterrupted power supply. The sensory testing center addition consists of three modular units, also referred to as trailers. These units were transported separately to the subject site using their own wheels. They were joined together at the site, with abutting walls removed so that the three units were combined to constitute one unified area. The combined units rest on concrete piers and are attached to the main building via a connecting walkway or vestibule. The addition is also connected to electric service.
Having concluded that both the Bioton and sensory testing center addition are “affixed,” I must next address whether either is taxable under the a or b test of N.J.S.A. 54:4-1. Consistent with the analysis in General Motors, I deal first with the b test which excludes from taxation property held for use in business provided that the property is not a structure. I conclude that both the Bioton and the addition are taxable under the b test *412 because both are structures. The Bioton has a foundation, concrete floor, metal panel walls, and metal roof. The addition has walls with siding, wood floors, and an asphalt shingle roof.
The third issue is whether the property is taxable under the a test. That test sets forth three criteria for non-taxability: 1) the personal property can be removed without material injury to the real property, 2) it can be removed without material injury to itself, and 3) the personal property is not ordinarily intended to be affixed permanently.
The Bioton is taxable under the a test because it cannot be removed without material injury to itself. The unit would have to be dismantled. Plaintiff made no showing that a custom-designed improvement like this can be reassembled elsewhere. Based on the nature of the construction of the Bioton and its function, which is odor emission control, the Bioton also is taxable under the a test because it is ordinarily intended to be affixed permanently.
The sensory testing center addition is taxable because it cannot be removed without material injury to the realty. As set forth above, direct access to the addition is available from the main building via a connecting walkway or vestibule. Therefore, removal of the addition would leave an opening in the wall to the main building. The addition also is taxable because it is ordinarily intended to be affixed permanently. The addition is connected to electric service, heated, and air-conditioned. The project description for construction of the addition does not describe it as temporary. Its purpose was, and continues to be, to free up space in the data center.
The proofs are that the sensory testing center addition was installed in late 1998. No proof was presented that the addition was in place as of October 1, 1998, the valuation date for tax year 1999. Therefore, I will exclude the addition from value for 1998 and 1999.
In summary, I conclude that the building area at the subject property for tax years 1998 and 1999 was 181,857 square feet (main building area of 175,501 square feet, plus warehouse and garage building containing 5000 square feet and miscellaneous *413 outbuildings containing 1356 square feet). For tax years 2000, 2001 and 2002,1 add to the main building area the sensory testing center addition containing 2160 square feet, so that, for each of those years, the main building area was 177,661 square feet and total building area was 184,017 square feet.
Plaintiff has made the following improvements to the facility. [The detailed description of the improvements, including construction of a greenhouse and potting shed, and extensive upgrading of the heating, ventilating and air-conditioning systems serving the laboratory and pilot plant areas of the main building, and their respective costs is omitted.]
I recognize that the preceding expenditures did not necessarily result in dollar-for-dollar or even proportionate increases in taxable value. Some of the expenditures may have included non-assessable equipment. However, the expenditures were substantial. As of December 1997, $5,405,633 was spent. This amount equals $42.98 per square foot for the entire laboratory/pilot plant area of 125,760 square feet, not all of which was affected by the new installations. As of October 1, 1999, cumulative expenditures were $6,259,933, or $49.78 per square foot. As of October 1, 2001, cumulative expenditures were $7,265,433, or $52.77 per square foot.
These improvements and upgrading, other than the greenhouse and potting shed (6.73% of total expenditures), addressed problems relating to the functioning of the laboratories and pilot plants, namely, odor contamination penetrating one laboratory from another, odor emissions, and high temperatures in pilot plants on hot summer days. By the first valuation date, October 1, 1997, most of the work was completed. By October 1, 1999, all work was completed except replacement of the pilot plant heating, ventilating, and air conditioning systems. This work was completed by March 2001.
Plaintiff disputed the effectiveness of the heating, ventilating, and air-conditioning work through the testimony of two scientists, its Director of Flavor Research and its Vice President and Director of Research Systems and Administrations. Both had re *414 search and supervisory responsibilities and testified that the foregoing expenditures did not achieve fully satisfactory odor control within the plant or the ability to produce samples to food grade standards. The scientists also testified about crowding in laboratories, an insufficient number of laboratories, and that the flavor pilot plant was too small.
The complaints as to the size and number of laboratories relate to the specifics of plaintiffs business operations. I infer that scientists would always prefer larger and newer facilities. As to the other alleged problems, plaintiff offered no testimony indicating that senior management scrimped on improvements nor any testimony describing what additional work should have been, but was not, done. Documentation suggests that the odor control problems were not substantial. [A detailed listing of the number of documented complaints per year is omitted.] The claimed inability to produce samples to food grade standards apparently was not of sufficient significance to cause senior management to address the issue. None of the foregoing complaints or problems was important enough to motivate either scientist to resign as an employee of plaintiff.
In addition to the scientists’ complaints, plaintiff presented testimony by its appraiser that the rate of air circulation in laboratories, seven times per hour, was below the industry standard of twelve or more times per hour. This testimony was based on hearsay information from one scientist who didn’t know the source of the information. Neither of the two scientists who testified provided any opinion or comment as to the rate of air circulation in laboratories. As previously described, plaintiff spent millions of dollars on improvements to the laboratory ventilation, exhaust, and cooling systems.
Plaintiff is an international company. Its research and development laboratories and pilot plants are critical elements of its operations. Plaintiff has described the subject property as “the headquarters for IFF’s world-wide corporate research effort.” I infer, therefore, that the company did not make the substantial expenditures described above in order to have its laboratories or *415 pilot plants function ineffectively, inefficiently, or in a manner below industry standards. All of the upgrading and improvement work was designed by an outside engineering firm, and, as plaintiffs internal capital appropriation request documents indicate, the purpose of the work was to meet industry standards and satisfy plaintiffs needs.
I conclude that air circulation as of each valuation date was adequate and did not impair the utility or function of the laboratories, and that none of the subjects of the complaints I have described had any meaningful impact on the utility of the subject property or its highest and best use.
For completeness, I note that additional expenditures were made on other projects at the main building. [The detailed description of the projects is omitted.] As of December 31, 1997 plaintiff had spent $192,910 on these other projects. As of October 1, 1998 the cumulative expenditure was $835,723; as of October 1, 1999 the cumulative expenditure was $1,085,283; as of December 31, 1999 the cumulative expenditure was $1,268,972; and as of October 1, 2000 the cumulative expenditure was $1,610,790. These expenditures do not automatically or necessarily translate into taxable value, but they do reflect plaintiffs recognition of the continuing utility and viability of the subject property to meet plaintiffs research and development needs.
III.

Highest and Best Use

Both appraisers concluded that the highest and best use of the property, as vacant, would be for industrial use. Plaintiffs appraiser, in his appraisal report, described highest and best use, as improved, as “industrial use.” In his testimony, however, he acknowledged that use of the property for research and development, including use of the laboratory space, would be maximally productive. Therefore, his conclusion was that highest and best use was as an industrial research and development facility. He emphasized that a market existed for this use but cautioned that *416 the market was far more limited than the general industrial market.
Defendant’s appraiser described the highest and best use of the subject property, as improved, as its current use, that is, as an industrial research and development facility, with possible expansion of the building.
I conclude that the testimony of the two appraisers is consistent, namely that: 1) the value of the subject property is higher with existing improvements than as vacant land, and 2) the highest and best use of the property as improved is as an industrial research and development facility utilizing the laboratories and pilot plants contained in the building.
IV.

Valuation

Plaintiffs appraiser valued the subject property using three valuation approaches — cost, income, and sales comparison. He gave most weight to his sales comparison approach because it “more accurately reflects the shopping process of buyers of owner-occupied properties and because of the quantity and quality of information in support of this approach to value.” He described his cost approach as “not the valuation method generally relied upon by buyers of older industrial facilities.” His income approach appears to have been given secondary weight after his sales comparison approach.
Defendant’s appraiser "also employed all three valuation approaches. He gave most weight to his cost approach “due to the highly unique nature of the subject improvements.” He used the sales comparison approach only to “indicate broad ranges of value for the subject property.” The appraiser described this approach and the income approach as having limited utility because of the difficulty in adjusting for variations between buildings and for renovation costs spent by purchasers or landlords or tenants. The appraiser used the income approach only as a test on his cost approach value.
*417 A. Plaintiff’s Valuation Analysis
I begin my discussion of the valuation analysis by plaintiffs appraiser with the approach on which he placed least reliance, the cost approach. I then will address his income approach, and lastly the approach on which he placed most reliance, the sales comparison approach.
1. Cost Approach
A cost approach has two elements — land value and the reproduction or replacement cost of the buildings and other improvements. Plaintiffs appraiser determined land value using the comparable sales approach and determined the value of buildings and improvements by using a replacement cost analysis. I turn first to the land sales used by plaintiffs appraiser.
The appraiser considered nine sales, rejected two due to small size, one due to special financing, and one due to lack of utilities. As to three of the remaining five sales, he made adjustments for market conditions, approvals, size, physical features, and location, and, as to the other two sales, concluded that no adjustments were necessary. The appraiser determined a per acre land value of $40,000 for each of tax years 1998, 1999, and 2000, $42,000 for 2001, and $44,000 for 2002.
I have one general concern as to the all sales used by plaintiffs appraiser, and that concern relates to highest and best use. To be comparable, a sale must have a highest and best use that is the same as or similar to the subject property. Appraisal Institute, The Appraisal of Real Estate 60 (12th ed.2001). “Potentially comparable properties that do not have the same highest and best use are usually eliminated from further analysis.” Ibid.; cf. Ford Motor Co. v. Edison Tp., 127 N.J. 290, 308, 604 A.2d 580 (1992) (stating that one important characteristic of a comparable sale is functional similarity to the property being valued). I also have specific concerns as to individual sales, even though some of the appraiser’s adjustments appear reasonable.
[The detailed discussion of the comparable land sales used by plaintiffs appraiser and my concerns as to each sale is omitted. I *418 rejected two sales because the purchaser was a government agency or authority; see Pepperidge Tree Realty Corp. v. Kinnelon Bor., 21 N.J.Tax 57, 67 (Tax 2008), appeal pending, No. A75803T5 (App.Div. Oct. 2, 2003). I questioned the reliability of one sale because it resold for over three times the sales price used by plaintiffs appraiser and the reliability of another because of the magnitude of gross adjustments; see Global Terminal & Container Serv. v. City of Jersey City, 15 N.J.Tax 698, 704 (App.Div.1996). I rejected the fifth sale because of its small size, its shape, its use by the purchaser for construction of a school, and the magnitude of gross adjustments.]
In considering the analysis of building and improvement costs by plaintiffs appraiser, it is important to understand the appraiser’s methodology. He was not concerned with the particular components of the subject property, such as the number and size of laboratories, number and size of pilot plants, utility services to laboratories and pilot plants, or the features of the sensory testing center. He had approximately 700 pages of building plans, but looked at them only in a cursory manner. He determined square footage for all components of the building, but this was not an important element in his valuation approach. He was more concerned with percentages of finished and unfinished space, and percentages of sprinklered and air-conditioned space.
In the appraiser’s opinion, a purchaser of the subject property, or any research and development facility, would not be concerned with the specific attributes of the facility because the purchaser typically would renovate the building to suit its own needs. This view of the property caused the appraiser, in his cost approach, to ignore the specifics of the subject property and, in his other approaches, to pay only minimal attention to the laboratories, pilot plants, utility services, sensory testing center, Bioton, and other specific features and attributes of the subject property and of his comparable leases and improved sales.
Consistent with this methodology, plaintiffs appraiser used replacement cost rather than reproduction cost to calculate the value of the subject buildings. Replacement cost is significantly *419 different from reproduction cost, as is evident from the following definitions:
Reproduction cost is the estimated cost to construct, as of the effective appraisal date, an exact duplicate or replica of the building being appraised, insofar as possible using the same materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, superadequacies, and obsolescence of the subject building.
Replacement cost is the estimated cost to construct, as of the effective appraisal date, a building with utility equivalent to the building being appraised, using contemporary materials, standards, design and layout. When this cost basis is used some existing obsolescence in the property is assumed to be cured.
[The Appraisal of Real Estate, supra, 357.]
To establish replacement cost, the appraiser used the comparative-unit method, which is described in The Appraisal of Real Estate as “relatively uncomplicated, practical, and widely used. Unit cost figures are usually expressed in terms of gross building dimensions converted to square feet.” Id. at 371. This method does not involve or require a breakdown of building components. The appraiser derived his per square foot unit costs from Marshall Valuation Service, a generally accepted source of such costs, using the building category Industrial Engineering (Research and Development), Class C — Good. The appraiser spoke with a person at Marshall Valuation who assured him that this building category contained laboratories and pilot plants, but provided no information as to the number or sizes of the laboratories or pilot plants, and no details as to the nature or extent of utility services included in the category.
Although he considered the subject building of average quality, plaintiffs appraiser used the Marshall Valuation “Good” classification rather than “Average” on the theory that the higher per square foot cost in the “Good” category would compensate for the number of laboratories, pilot plants, and other special features of the subject property. However, the appraiser had no factual information from Marshall Valuation or elsewhere to support his theory. Marshall Valuation’s descriptions of average and good quality Class C Industrial Engineering buildings are in their entirety, as follows:
*420 [[Image here]]
Even assuming that Class C Industrial Engineering Buildings include laboratories and pilot plants, plaintiffs appraiser had no knowledge of whether the per square foot cost in the “Good” category reflected to any extent the features of the subject property. In addition, the appraiser failed to take info account the millions of dollars spent by plaintiff as discussed above.
The appraiser provided no testimony as to, and presumably had no knowledge of, what “contemporary materials, standards, design and layout” would comprise his hypothetical replacement facility. The Appraisal of Real Estate, supra, at 357. A replacement building constructed as of any of the valuation dates in issue could be smaller-or larger than the subject building; the third floor might be eliminated. Without specific information as to how the replacement building would be designed, it is impossible to determine the cost of the facility or what depreciation factors to apply.
In short, plaintiffs appraiser valued a hypothetical replacement building. He had only vague and generalized knowledge of the characteristics of this building and could only guess at the similarity of the hypothetical building to the subject improvements. Consequently, the appraiser’s cost analysis of the subject improvements provides no assistance in valuing the subject property for assessment purposes. I reject the analysis and therefore reject the appraiser’s cost approach. Even if I were to determine a land value using the comparable sales on which plaintiffs appraiser relied, I could not determine a property value because, without a meaningful, reliable analysis of building and improvement costs, the cost approach is useless.
2. Income Approach
The income approach used by plaintiff’s appraiser as a secondary basis for valuing the subject property suffers from the *421 major infirmity that, without a detailed analysis of the laboratories, pilot plants, utility services, Bioton, and sensory testing center at the subject property, and without a detailed comparison of those features with the features of the space constituting each of his comparable leases, the appraiser could not make appropriate adjustments. Rent is sensitive to the particular characteristics of leased space — thus the need for adjustments in valuing all types of rental property for items such as size, age, condition, and location. The number of laboratories and pilot plants and the types of utilities available in research and development buildings are important and influence rent. Plaintiffs appraiser did not even attempt to adjust for these features and was unable to do so because he did not obtain the necessary information to make the adjustments.
This infirmity is not eliminated by the appraiser’s assertion that a user of a building such as the subject would require modifications to satisfy the user’s particular requirements. As I will discuss more fully in my analysis of the sales comparison approach of plaintiffs appraiser, a comparable sale or rental first must be adjusted to bring it to a condition similar to the subject property with forty laboratories and three pilot plants. Then the costs of additional modifications, and the extent to which the landlord or tenant would be expected to pay for them, can be considered. Plaintiffs appraiser has done none of this analysis.
The appraiser’s income approach is deficient in other respects. Two of the three comparable leases on which he primarily relied, and four of the five comparable leases he considered, had no laboratory space at all and were used as warehouses, or, in one instance, for light manufacturing and showroom in addition to warehouse and offices. All of these properties had a different highest and best use from the subject and are not comparable to the subject. As I discussed in my analysis of the land sales used by plaintiffs appraiser, comparable properties should have a highest and best use the same as or similar to the highest and best use of the subject property. This principle is equally applicable to comparable rentals. “The appraiser also analyzes the leases of competitive properties to estimate market rent and other forms of *422 income applicable to the market for competitive space.” The Appraisal of Real Estate, supra, at 502. Properties with no laboratories simply are not competitive with or comparable to the subject. If plaintiffs appraiser had determined the cost of installing the labs and other important features of the subject building in the comparables, comparability might be established. But he made no attempt to do this.
One lease used by the appraiser had a substantial amount of laboratory space, but the lease transaction included a leaseback to the landlord of 30,000 square feet out of 250,000 square feet with the landlord having the right to remove some “built-in laboratory furnishings and fixtures.” The leaseback rent was more than 175% of the prime lease rent on which plaintiff’s appraiser relied. In addition, the landlord assumed full maintenance obligations as to a portion of the common areas in the building. A lease-leaseback transaction is not a reliable indicator of market rent because the main lease rent could be influenced by the sublease rent and by the landlord’s need to retain a portion of the space. See The Appraisal of Real Estate, supra, at 500; J.C.T. Assoc. v. Boonton, 4 N. J.Tax 283, 288 (Tax 1982).
Because plaintiffs appraiser has failed to establish the appropriate market rent for the subject property, the first and crucial step in an income approach analysis, I reject the appraiser’s income approach analysis. Therefore, I need not discuss the other elements of his analysis, namely the vacancy and collection loss percentage, expenses (stipulated by the parties at 11% of effective gross income), and capitalization rate.
3. Sales Comparison Approach
In his comparable sales approach, plaintiffs appraiser relied on seven sales (Sale 1A was a resale of Sale 1). [The detailed discussion of Sales 1, 1A, 2, 3 and 4 is omitted.]
The appraiser’s Sale No. 5 was located on Route 22 in Branch-burg, New Jersey. The sale occurred on February 13, 1997 at a price of $5,300,000 ($33.13 per square foot). The property consisted of an industrial building with no laboratories. The building *423 was used as a warehouse with offices and had tenants at the time of sale. Thus, the sale was of a leased fee interest with a probability that the price was influenced by the amount of the rental income stream. The Appraisal of Real Estate states as follows with respect to leased fee interests:
If the rent and/or terras of the lease are favorable to the landlord (lessor), the value of the leased fee interest will usually be greater than the value of the fee simple interest, resulting in a negative leasehold interest. If the rent and/or terms of the lease are favorable to the tenant (or lessee), the value of the leased fee interest will usually be less than the value of the fee simple interest, resulting in a positive leasehold interest. The negative or positive leasehold interests will cease if contract rent and/or terms equal market rent and/or terms any time during the lease or when the lease expires.
When analyzing a leased fee interest, it is essential that the appraiser analyze all of the economic benefits or disadvantages created by the lease.
[The Appraisal of Real Estate, supra, at 82.]
See also University Plaza Realty Corp. v. City of Hackensack, 12 N.J.Tax 354, 366 (Tax 1992), aff'd, 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.1993), certif. denied., 134 N.J. 481, 634 A.2d 527 (1993); WCI — Westinghouse, Inc. v. Edison Tp., 7 N.J.Tax 610, 624 (Tax 1985), aff'd o.b., 9 N.J.Tax 86 (App.Div.1986). Plaintiffs appraiser presented no analysis of the leases at the sale property or their economic benefits or disadvantages.
The appraiser’s improved Sale No. 6 was located on Route 130 in South Brunswick, New Jersey. The sale occurred on December 18, 2002 (over one year after the last valuation date in issue) at a price of $10,600,000 ($42.40 per square foot). The sale was in the context of bankruptcy proceedings, and, therefore, was a non-usable sale under N.J.A.C. 18:12-1.l(a)(13)[2] (listing the twenty-seven categories of sales deemed non-usable for purposes of the sales ratio studies of the Director of the New Jersey Division of Taxation). The brokerage listing described property as “light manufacturing.” The property was leased at the time of sale (comparable lease No. 1 used by plaintiffs appraiser), and the lease was assigned to the buyer. The seller-landlord had leased back space at a rent more than 175% of the lease rent. Plaintiffs *424 appraiser gave no testimony as to the significance of these markedly different rental amounts. The sale building contained fifteen wet laboratories with fifteen stability rooms and a pilot plant. The appraiser gave no testimony as to the details of these facilities. Because of (1) the bankruptcy proceedings, (2) the lease of the property at the time of sale with a partial leaseback at almost double the rent, and (3) the potential impact of the base lease-leaseback on the sales price, this sale provides no meaningful or reliable indication of the value of the subject property.
I conclude that the appraiser’s sales comparison approach is inadequate to prove the value of the subject property for the following reasons. The subject property is dominated by a combination of sophisticated laboratories, pilot plants, multiple utility services, a Bioton, and a sensory testing center. As compared to such a facility, generic industrial buildings without similar facilities either have a different highest and best use or, even if deemed to have a similar highest and best use, must be adjusted for differences in facilities and features. This adjustment requires a detailed knowledge of the subject property and each comparable. Plaintiffs appraiser did not possess this knowledge and made no analysis of the specific features of the subject property or any of the comparables.
That buyers generally renovate or retrofit a laboratory facility does not excuse the necessity for obtaining the detailed knowledge and making the analysis. Even a buyer that would renovate or retrofit a property would care about the starting point for the retrofit. For example, a buyer with a need for forty laboratories and three pilot plants presumably would be willing to pay more for the subject property than for a building with four laboratories and no pilot plants, because renovation and retrofitting costs for the subject property would be lower. Plaintiffs appraiser failed to demonstrate that any of the comparables was similar to the subject property in terms of laboratories, pilot plants, utility services, Bioton, and sensory testing center. To derive a value from improved comparable sales, an adjustment must be made for the cost of bringing each sale property to the same starting point as the subject property. Plaintiffs appraiser did not and could *425 not make such an adjustment because he did not obtain the necessary information as to the subject property or any of the comparables.
The appraiser based his physical condition adjustments on finished space, sprinklered area, air-conditioned space, quality of construction, general condition, and ceiling height. These are valid considerations and valid bases for adjustment, but the essence of the subject property, consistent with its highest and best use, is as a research and development facility containing laboratories, pilot plants, special utility services, a sensory testing center, and Bioton. Plaintiffs appraiser has ignored all of these features. Just as he determined replacement cost for a hypothetical building, he has adjusted his sales comparables to a hypothetical building lacking the main and essential features and characteristics of the subject property, and, in making his adjustments, he gave no consideration to the millions of dollars spent by plaintiff (as described previously) to upgrade and improve the subject property. The appraiser’s comparable sales valuation approach, therefore, provides no reliable indication of the value of the subject property.
B. Defendant’s Valuation Analysis
I turn now to defendant’s valuation proofs. Defendant’s appraiser presented three approaches to value. He used his sales comparison approach only to establish a broad range of values for the subject property, relied primarily on his cost approach, and used his income approach as a check on his cost approach. As I did in discussing the valuation analysis of plaintiffs appraiser, I will address first the valuation approach relied upon least — for defendant’s appraiser, the sales comparison approach, then I will address the secondary valuation approach — for defendant’s appraiser, the income approach, and lastly I will address the approach upon which primary reliance was placed — for defendant’s appraiser, the cost approach.
As set forth above, plaintiffs appraiser determined the same value for the subject property for all years under appeal. Defen *426 dant’s appraiser determined a different value for each year. His analysis is contained in two reports, one covering 1998-2000 (with a supplement revising his cost approach for those years after examining additional building plans provided by plaintiff) and a second report covering 2001 and 2002. In his sales comparison approach, he relied on the same four sales for all years and one additional sale for 2001 and 2002. In his income approach he relied on rental comparables for 2001 and 2002 different from those he used for 1998-2000. In his cost approach, he relied on two land sales for all years and otherwise used sales for 2001 and 2002 different from the sales he used for 1998-2000.
1. Sales Comparison Approach
The sales comparison approach of defendant’s appraiser (which he used only to establish a broad range of values for the subject property) provides little assistance in determining the value of the property. Of the four sales he used for all years, two were sales of leased fees, and therefore the sales prices, at least to some extent, probably were influenced by the income streams from the leases. The appraiser did not attempt to demonstrate that the lease rents were at market rates. In addition, the buildings included in these sales were less than one-fifth the size of the subject building and, for this reason alone, in the context of the subject facility, are not competitive and therefore not comparable. I am unconvinced by the appraiser’s testimony that, with respect to laboratory buildings, functional utility is far more important than size, particularly with respect to these sales where the appraiser had not seen the laboratories in the sale buildings. It is highly unlikely that a buyer- seeking a facility of the size of the subject property would consider a facility of the size of either of these two comparables.
Another sale on which the appraiser relied involved a seller that had given instructions to sell the property within one year, if possible. This time constraint may have produced a special motivation and undercuts the reliability of the sale as an indicator of market value. It is unclear whether the appraiser had seen the labs in this budding.
*427 The appraiser’s Sale No. 5 which he used only for tax years 2001 and 2002, is approximately two and one-half times the size of the subject property and was purchased in connection with the acquisition of four office buildings. The appraiser had not seen the interior of the sale property. Although his net adjustment to this sale was +5%, his aggregate gross adjustments were 73%. This alone indicates that the sale is not comparable, especially in light of the significantly larger size of the comparable building. The magnitude of net adjustments is a less reliable indicator of accuracy than the magnitude of gross adjustments. “The net adjustment is calculated by totaling the positive and negative adjustments and subtracting the smaller amount from the larger amount. A net adjustment figure may be misleading because one cannot assume that any inaccuracies in the positive and negative adjustments will cancel each other out.” The Appraisal of Real Estate, supra, at 447.
The appraiser’s Sale No. 1, used for all years under appeal, appears to be reasonably comparable. But he did not see the interior of the building, and plaintiff has raised questions as to whether the condition of the facility was significantly better than the subject, necessitating a substantial downward adjustment for condition. As it is, the appraiser’s gross adjustments to this sale totaled 43% for 1998-2000 and 53% for 2001 and 2002.
Although not used by plaintiffs appraiser as one of his sales comparables, plaintiff argues that this sale “when properly adjusted” supports the sales comparison approach used by plaintiffs appraiser. I reject this argument because plaintiffs appraiser had insufficient knowledge of the sale property to determine what would constitute proper adjustments. He did not see the property, and his critique of the analysis by defendant’s appraiser was based on a review of a portion of an appraisal prepared by another appraiser. Plaintiffs appraiser confirmed the description of the property contained in this appraisal with a representative of the buyer. The appraisal makes no reference to pilot plants, indicates that 17.5% of building area was “common space” and 8.4% was “shell space.”
*428 As discussed above with respect to the sales comparison approach used by plaintiffs appraiser, without extensive knowledge of the details of the subject building and each comparable sale, the appraiser is unable to make reliable adjustments. Plaintiffs appraiser lacks that knowledge as to Sale No. 1 used by defendant’s appraiser, just as plaintiffs appraiser lacked sufficient knowledge to adjust the improved sales contained in his appraisal. Consequently, plaintiffs attempt to rely on Sale No. 1 used by defendant’s appraiser in no way compensates for the previously discussed deficiencies in the sales comparison approach by plaintiffs appraiser, and Sale No. 1 in itself is not a reliable indicator of the value of the subject property.
Defendant’s appraiser acknowledged the difficulty in making proper adjustments in comparable sales due to the dissimilarities between research and development buildings, for example, in number and sizes of laboratories, number and sizes of pilot plants, and utility services. The appraiser gave his sales comparison approach little weight, and I will do the same. I will consider it only as suggesting (not establishing) the broad range of value to which the appraiser referred. This is an appropriate use of the sales comparison approach:
The sales comparison approach is a significant and essential part of valuation process, even when its reliability is limited. Although appraisers cannot always properly identify and quantify how the factors affecting property value are different, they can still use the sales comparison approach to determine a probable range of value in support of a value indication derived using one of the other approaches.
[The Appraisal of Real Estate, supra, at 421.]
2. Income Approach
Defendant’s appraiser also gave little weight to his income approach for 1998-2000. I concur with his judgment. The appraiser considered six leases, but excluded one (Lease No. 2) from his analysis because, after adjustment, it reflected a rent well outside the range indicated by the other comparables. Of the five leases he used to establish market rent, one was for 35,844 square feet, another for 50,000 square feet, a third for 23,000 square feet, a fourth for 33,354 square feet and the fifth for 31,423 square feet. *429 Size alone disqualifies these leases from comparability to an approximately 180,000 square foot research and development building such as the subject facility. The appraiser did not see the laboratory space in two rental properties (No. 2 and No. 6). In the largest of the rentals, 50,000 square feet (No. 3), the rent is based on renewal options. Special motivations may apply in a renewal situation — the landlord’s desire to retain the tenant, the tenant’s desire not to incur the inconvenience and expense of relocation. Thus a renewal rent, without extensive investigation (apparently not done by defendant’s appraiser), is a dubious basis for establishing market rent.
The appraiser provided information as to an additional lease for property at 101 Mettlers Road, Franklin Township, Somerset County. He adjusted and relied on this lease in his income approach for tax years 2001 and 2002. Although he made adjustments to this lease for 1998-2000, it did not influence his conclusion as to market amount for these years. Consequently, I will not rely on this lease for tax years 1998-2000.
Because of the foregoing concerns, I find that the rental compa-rables used by defendant’s appraiser do not provide a reliable basis for estimating market rent for tax years 1998,1999 and 2000. As a result, I give little weight to the income approach valuation by the appraiser for those years, and need not discuss the vacancy and collection loss allowance and capitalization rates he used.
Defendant’s appraiser considered his income approach analysis for 2001 and 2002 to be based on better rental information and therefore a reliable check on his cost approach for those years. He derived market rent from seven comparable rentals, one of which (No. 6) also appeared in his 1998-2000 analysis. Of the seven comparables, four are for leased premises less than one-fifth the size of the subject building. For the reasons set forth above, I conclude that these properties are not comparable to the subject property. Consequently, I give these four leases virtually no weight in my analysis.
The remaining three leases are closer in size to the subject, but the difficulty of adjusting for the differences between the features *430 of each of the comparables and the features of the subject property remains and casts doubt on the reliability of the appraiser’s conclusion as to market rent from the three comparables.
[The detailed discussion of the three rental comparables is omitted.]
On the basis of his seven comparables, defendant’s appraiser determined a market rent of $21 per square foot, net, as of October 1, 2000 with a 5% increase to $22 per square foot, net, as of October 1, 2001 for the 2002 tax year. The three leases I have discussed support this determination, although I have little confidence in its accuracy because: as to Rental 1 — the rent may have been inflated because of the tenant’s needs; as to Rental 2 — the building is less than one-half the size of the subject property; and as to Rental 3 — defendant’s appraiser was mistaken as to the number of stories in the building and gave a sketchy description of the space.
Defendant’s appraiser deducted a 5% vacancy and collection loss allowance. Although I rejected the income approach by plaintiffs appraiser, I find that his vacancy and collection loss allowance of 10% is better supported and will use that percentage. As noted above, income approach expenses have been stipulated at 11% of effective gross income. Defendant’s appraiser used a capitalization rate as of October 1, 2000 of 10.2% and 10% as of October 1, 2001. Plaintiffs appraiser used 9.5% for both years. Because of the limited utility of the income approach used by defendant’s appraiser, that is, only as a check on his cost approach value, and because I lack confidence in the appraiser’s determination of rent and therefore lack confidence in the overall reliability of his income approach for tax years 2001 and 2002, I will use a capitalization rate of 9.75% for both years without further analysis.
The foregoing rental amounts, vacancy and collection loss allowance, expenses, and capitalization rate produce a value of $31,747,179 as of October 1, 2000 and $33,258,954 as of October 1, 2001. To each of these amounts, defendant’s appraiser added the value of eight acres of what he described as surplus land on which *431 expansion would be possible under applicable zoning regulations. [The dollar amount added for each year is omitted.]
I reject the appraiser’s surplus land analysis because he failed to demonstrate that expansion of the subject improvements using all eight acres was physically feasible (no potential building layout was prepared) or that market demand existed for the land at the per acre prices the appraiser used. These prices were derived from his cost approach.
Surplus land is not needed to support the existing improvement and typically cannot be separated from the property and sold off. Surplus land does not have an independent highest and best use and may contribute a minimal value.
Now consider an industrial park where land-to-building ratios for warehouse properties range from 2.8-to-l to 3.5-to-l and land value is $2.00 per square foot. The subject property is a 20,000-sq. ft. warehouse on a 100,000-sq. ft. site, which results in a land-to-building ratio of E-to-1, well above the market area norm. If the additional land not needed to support the highest and best use of the existing property were in the back portion of the site, lacking access to the street, that land would probably be considered surplus land because it could not be separated from the site and does not have an independent highest and best use. In this situation, the surplus land would probably still contribute positively to the value of the subject property (because the existing improvements could still be expanded onto the surplus land), but it would also most likely be worth much less than the $2.00 per square loot price commanded by vacant land elsewhere in the industrial park.
L The Appraisal of Beal Estate, supra, at 199-99.]
See also, United Jersey Bank-Peoples Trust of NJ v. Lincoln Park Bor., 11 N.J.Tax 549, 557-58 (Tax 1991).
3. Cost Approach
I turn now to the cost approach valuation presented by defendant’s appraiser, starting with an analysis of his land value determination based on comparable sales. For tax years 1998, 1999 and 2000, the appraiser relied on seven sales, and adjusted each sale for conditions of sale, market conditions, location, utilities, zoning, and size. I find that the appraiser’s individual adjustments are reasonable, but, as to some sales, I am concerned by the magnitude of the aggregate gross adjustments.
[The detailed discussion of the comparable land sales used by defendant’s appraiser is omitted.]
*432 In summary, as of October 1, 1997, Sales 1, 6 and 7, the sales used by defendant’s appraiser on which I place most weight, as adjusted by him, reflect a per acre value for the subject land of $95,256, $91,811, and $95,057, respectively. I give some weight to his Sale 3 ($100,480 per acre) and very little weight to Sales 2 ($72,072 per acre), 4 ($101,200 per acre) and 5 ($95,124 per acre). I also take into account two sales used by plaintiff’s appraiser, his Sales Nos. 6 and 8, reflecting a per acre value for the subject land of $40,000 and $35,750 respectively. The gross adjustments by plaintiffs appraiser to his Sale No. 8 totalled 45%. As a result, I will give little weight to this sale. I give some weight to his Sale No. 6, keeping in mind that it resold for three times the sales price used by plaintiffs appraiser. I give most weight to Sales Nos. 1 and 6 used by defendant’s appraiser and some weight to his Sale No. 7.1 conclude that the fair market value of the subject land as of October 1,1997 was $85,000 per acre.
For each of tax years 1999 and 2000, defendant’s appraiser made a positive 5% adjustment for market conditions. I find this adjustment to be reasonable and adequately supported. I reject the position of plaintiffs appraiser that no market appreciation occurred between October 1, 1997 and October 1, 1999. Adding 5% per year to $85,000 on a non-compounding basis produces a per acre land value as of October 1, 1998 for tax year 1999 of $89,250, and a per acre value as of October 1, 1999 for tax year 2000 of $93,500.
For tax years 2001 and 2002, defendant’s appraiser relied on nine land sales, two of which were considered by-the appraiser for tax years 1998-2000, however with different adjustments for market conditions. [The detailed discussion of the comparable land sales is omitted.]
In summary, I place most weight on sales Nos. 1, 2 and 7, reflecting per acre land values for the subject property as of October 1, 2000 of $107,285, $112,539 and $107,783, respectively. I give less weight to Sale 3 ($123,947 per acre) and Sale 8 ($117,079 per acre), little weight to Sale 5 ($129,420 per acre) and Sale 6 ($132,273 per acre) and virtually no weight to Sale 4 ($126,633 per *433 acre) and Sale 9 ($98,849 per acre). I will also give some consideration to Sales Nos. 6 and 8 used by plaintiffs appraiser, which, as adjusted by him, reflected per acre values for the subject land as of October 1, 2000 of $42,000 and $37,538 respectively, after adjusting each sale by a positive 5% for market conditions in a manner consistent with the opinion of defendant’s appraiser that market values increased by 5% from October 1, 1999 to October 1, 2000.
Based on the preceding analysis, and considering the rates of annual appreciation applied by both appraisers, I conclude that the land value of the subject property was $100,000 per acre as of October 1, 2000. This reflects a 6.95% increase from my per acre land value as of October 1, 1999. Given the strong sales data provided by defendant’s appraiser that could support a land value of $110,000 per acre or more as of October 1, 2000,1 conclude that this percentage increase is reasonable, well-supported, and reasonably close to the percentage increase acknowledged by plaintiffs appraiser. Both appraisers determined that values increased by 5% between October 1, 2000 and October 1, 2001, and I accept their determination. Accordingly, I find a land value as of October 1, 2001 of $105,000 per acre.
Based on the preceding per acre land value determination, I find the following values for the 20.58 acres contained in the subject property.
1998- $1,749,300
1999- $1,836,765
2000- $1,924,230
2001- $2,058,000
2002- $2,160,900.
In his determination of the second element of the cost approach, the value of the buildings and improvements, defendant’s appraiser used reproduction cost, not replacement cost. He relied primarily on the analysis of a cost estimator whom the appraiser had engaged. The estimator had performed cost analyses of over fifty research and development buildings throughout the United States, including pharmaceutical laboratories, medical laboratories, and quality control laboratories. The estimator inspected the subject *434 property on two occasions, spending a total of over four hours, but did not have access to or inspect every element of the property. He relied primarily on the approximately 700 pages of detailed construction plans obtained from plaintiff. He spent over 200 hours reviewing the plans.
With respect to the main building, warehouse, guard house, and site improvements at the subject property, the estimator accepted the building areas determined by defendant’s appraiser. Using the construction plans, the estimator determined the identity, quantity, and cost of each component of the construction. This is known as the quantity survey method and is “[t]he most comprehensive and accurate method of cost estimating ... [It] reflects the quantity and quality of all materials used in the construction of an improvement and all categories of labor required.” The Appraisal of Real Estate, supra, at 379. The estimator derived the costs for the various components from the computerized versions of the R.H. Means Construction Cost and Assemblies Cost Manuals. These are generally accepted sources of construction costs. The Means Manuals assign a code number to each construction element and set forth a per unit (for example, square foot, linear foot) cost for each. Costs are adjusted for geographic location.
The estimator determined one reproduction cost for tax years 1998, 1999 and 2000 and a separate cost for tax years 2001 and 2002. All costs were derived from the Means Manuals for January 2000. The Manuals contain percentage adjustments (trending factors) to be used with valuation dates other than January 2000. Defendant’s appraiser, using the Means January 2000 costs and Means trending factors, adjusted the costs for the October 1,1997, 1998, 2000 and 2001 valuation dates, but made no adjustment for the October 1,1999 valuation date because of its proximity in time to January 2000. The appraiser also determined the amounts to be added to the costs determined by the estimator (as adjusted for time) for the following items:
Contingencies
General Conditions
General Contractor Profit
Soft Costs, including:
*435 Architeet/Engmeering & Design Fees, and
Miscellaneous Fees
Construction Interest Relating to Improvements
Interest Relating to Land
Real Estate Taxes
Entrepreneurial Profit.
The estimator performed a cost approach valuation on miscellaneous outbuildings using the comparative unit method and deriving his unit costs from the Boeckh Building Valuation Manual, another generally accepted source of construction cost data. He determined that this Manual was more appropriate than the Means Manuals given the size and nature of the outbuildings.
As the final element of defendant’s improvement cost analysis, its appraiser determined appropriate depreciation resulting from physical deterioration, functional obsolescence, and external obsolescence.
Defendant’s appraiser determined the following aggregate reproduction costs for the main building, warehouse, guard house, outbuildings and site improvements based on the analysis and calculations of the cost estimator, and application of the Means trending factors:
1998- $24,125,592
1999- $24,632,117 [3]
2000- $25,483,115
2001- $28,580,904
2002- $29,472,931.
To these costs the appraiser added the following:
Contingencies — 5% based on the Means Construction Cost Manual guidelines for this factor and taking into account the complexity of the utility, ventilation, and piping systems, and the varied building components (laboratories, pilot plants, data center) at the subject property.
*436 General Conditions [4] — 10% based on the Means Assemblies Cost Manual guideline of 5 to 15% with 10% described as the typical allowance.
General Contractor Profit — 10% based on the Means Construction Cost Manual indicating a profit range of 5-15% with the average profit being 10%. This assumes that profit for subcontractors and material suppliers is built into the Means cost numbers. The 10% profit takes into account the size and complexity of the subject facility.
Soft Costs — The appraiser used 7% for architectural, engineering and design fees based on the Means Assemblies Cost Manual which indicates a percentage of approximately 7.5% for a project such as the subject improvements.
For other fees, the appraiser used 2% based on the Means Construction Cost Manual with additions for legal, accounting, appraisal and environmental audit fees.
Construction Interest — Improvements—Defendant’s appraiser based his interest calculation on a two year construction period which is consistent with the construction time estimates in the Means Assemblies Cost Manual. He then assumed monthly advances of a construction loan, analyzed prevailing loan interest rates, prime rates, federal funds rates and LIBOR rates for the years under appeal, and concluded that a 9% per annum interest rate would be appropriate for tax years 1998-2001 and 6% for 2002. He then analyzed interest cost on a monthly basis, and determined aggregate interest of 9.8% of improvement reproduction cost over the twenty-four month construction period for each of tax years 1998-2001, and 6.4% for tax year 2002.
Construction Interest — Land—In determining the interest cost on land during the two year construction period, the appraiser used the same interest rates, 9% and 6%, and applied them on a per annum basis to his land values.
*437 Real Estate Taxes — The appraiser determined estimated land taxes during construction using his land values and assumed a 25% completed building as of each assessment date based on his reproduction costs plus the preceding items. He used the actual Union Beach tax rate for each year.
The appraiser did not add amounts for contingencies, general conditions, general contractor’s profit and architectural fees to the reproduction cost of the miscellaneous outbuildings because these items are included in the Boeckh Manual cost amounts.
To reproduction costs increased by the preceding items defendant’s appraiser added entrepreneurial profit of 10%.
Plaintiff challenged defendant’s reproduction cost proofs, in cross-examination and in rebuttal testimony, primarily on the following bases:
1) the cost estimator included items shown on the plans but not physically present on the valuation dates;
2) the cost estimator used excessive areas for certain building features such as fire protection systems, heating systems, air-conditioning, and acid-resistant brick flooring;
3) the cost estimator misdescribed, and therefore mispriced, certain components of the building;
4) the cost estimator improperly applied the Means Manuals in calculating certain costs resulting in excessive cost amounts; and
5) the percentages used by defendant’s appraiser for contingencies, general conditions and general contractor’s profit were excessive.
Plaintiff did not challenge the determinations by defendant’s appraiser of soft costs and real estate taxes during construction other than to suggest in cross-examination of the appraiser that the aggregate add-on percentages for these items, and for contingencies, general conditions and general contractor’s profit, were excessive.
As to entrepreneurial profit and depreciation, plaintiff suggested general criticisms in cross-examination of defendant’s appraiser, but did not attempt to rebut the conclusions of defendant’s appraiser as to these items, except to the extent plaintiffs appraiser used different percentages.
With respect to the cost estimator’s work, cross-examination demonstrated the following errors:
*438 [The detailed list of errors is omitted.]
As a rebuttal witness to challenge the cost estimator’s work, plaintiff presented an appraiser who rendered no opinion as to defendant’s cost approach, but simply provided his observations as to whether certain items existed at the subject property as of the applicable valuation dates. I ruled that, in providing this type of testimony, the witness was not testifying as an expert, but as an informed lay observer. Consequently, testimony by him based on hearsay was not related to an expert opinion and was not probative. Much of the information to which this witness testified was not based on personal observation but was told to the witness by plaintiffs Manager of Bayshore Engineering Services. This person served in that position starting in 1998 through the conclusion of the trial and served as Facility Engineer for the subject property from 1986-98. In both capacities, he had responsibilities for, and detailed knowledge of, the subject property. Plaintiff provided no explanation for its failure to produce this person as a witness. He remains in plaintiffs employ.
I disregard testimony by the rebuttal witness based on hearsay. Based on personal observation the witness did establish the following errors in the cost estimator’s work. [The detailed list of errors is omitted.]
The witness testified that no helipad existed at the property, but a photograph included in the appraisal reports of defendant’s appraiser shows a wind sock and a building plan shows a “Day Time Helipad.” Consequently, I conclude that a helipad existed at the subject property.
The witness also testified that the cabinets and countertops in the laboratories could be moved without damage to the floor, thereby suggesting that they constituted non-taxable personal property. This testimony appears to have been based on a cursory observation of these installations. The plans for the cabinetry and countertops in the laboratories reveal that these items were custom-designed for, and custom-installed in, the different types of laboratories. The design specifically accommodated utility services and the fume hood exhaust systems for the *439 laboratories, and the cabinets often had special bracing. I conclude that the cabinets and countertops were affixed to the real estate. The evidence established that, although constituting equipment used in plaintiffs business under the b test of N.J.S.A. 54:4-1, the cabinets and countertops could not be removed or severed without material injury to themselves and were ordinarily intended to be affixed permanently. Consequently, they are taxable under the a test of N.J.S.A. 54:4-1.
Plaintiff also challenged the cost estimator’s work through the testimony of the senior editor of the Means cost manuals. This witness critiqued several elements of the cost estimator’s work and the cost approach analysis of defendant’s appraiser. I reject most of the witness’s testimony for the following reasons:
1) he lacked knowledge of the actual construction features of the subject property, and therefore his conclusions as to the use of Means costs were unreliable;
2) he was unable to identify exactly what was included in several Means cost categories;
3) he provided personal judgments as opposed to judgments set forth in the Means manuals, had insufficient knowledge to make those judgments, and was not offered or qualified as an expert other than as to the use of the Means Manuals. This witness spent two to four hours studying nine or ten of the approximately 700 drawings available to him, and flipping through the rest for the limited purpose of getting a general sense of the subject buildings. The witness spent most of his time on those few drawings giving an overall view of the property such as elevations and foundation drawings, and was not interested in, nor did he look for, building details. He did not look at the capital appropriation requests I discussed earlier, but may have glanced at some after preparing his analysis.
The witness’s analysis of the subject building, and his testimony reflected the nature and extent of his knowledge, or lack of knowledge, of the building. [The detailed discussion of the Means witness’s testimony as to reproduction costs is omitted.]
As to contingencies, the Means witness testified that an add-on was inappropriate because the subject building exists. This witness gave similar testimony in B.F. Goodrich Co. v. Oldmans Tp., 17 N.J.Tax 114 (Tax 1997). Judge Axelrad rejected the testimony in that case, noting that “this is the type of cost anticipated in the marketplace for construction of this kind of facility” (there a 35,000 square feet multi-story latex manufactur *440 ing and warehouse building). Id. 120. I reject the testimony as well. Reproduction cost analysis is intended to determine what the cost of construction of improvements would be as of the applicable valuation date or dates. That the building already exists does not render inappropriate the consideration of all items which would be taken into account in the marketplace for purposes of determining the cost to replicate the facility. The Means Cost manuals specifically set forth percentages to be used for contingencies. A contingency represents “a margin to allow for unforeseen construction difficulties.” Means Assemblies Cost Manual, p. vii (Jan.2000). The recommended percentage with final drawings is 2 to 3%. Defendant’s appraiser used 5% because of the complexity of the subject building and its wiring, piping and ventilation systems. I find this percentage to be reasonable for the subject property and will add 5% to reproduction cost for contingencies.
As to add-ons for general conditions and general contractor profit, the Means witness testified that the appropriate percentage for each was 6% and not the 10% used by defendant’s appraiser. Ten percent is the percentage described by Means Manuals as the “most typical allowance” for general conditions and as the average percentage to be added to costs that already include overhead and profit for subcontractors, with 5% as the minimum. The Means witness testified that these percentages should be on a sliding scale, decreasing as the dollar value of a construction project increases. He acknowledged that this was his personal opinion, not included or reflected anywhere in the Means Manuals and that the percentage to be used in each category was a matter of judgment based on market conditions.
The Means witness had no greater expertise than defendant’s appraiser as to the appropriate add-ons for general conditions and general contractor profit. The Means witness had no knowledge of the local market, and defendant’s appraiser had extensive knowledge. Therefore, I accept the percentage of 10% used by defendant’s appraiser for each of general conditions and general contractor profit.
*441 As I noted above, plaintiff presented only the most general challenge to the other add-on items used by defendant’s appraiser. I find that this challenge failed to demonstrate the impropriety or inaccuracy of any of those items. Consequently, I will add the following to reproduction cost for each of the designated years:
Soft costs — 9%
Construction Interest — Improvements— 9.8%-1998-2001
6.4%-2002
Land Interest — . 18% (9% per annum for two years)-1998-2001
12% (6% per annum for two years)-2002
Real Estate Taxes— a dollar amount using the actual tax rate for each year under appeal multiplied by 25% of reproduction cost, increased by the preceding add-on percentages.
The final add-on by defendant’s appraiser was 10% for entrepreneurial profit. Plaintiffs appraiser added a percentage to his replacement cost of 10% for soft costs and entrepreneurial profit combined. Thus, there is no dispute that the addition of a factor for entrepreneurial profit is appropriate. Only the amount is at issue.
I discussed entrepreneurial profit, also called entrepreneurial incentive, in American Cyanamid Co. v. Wayne Tp., 17 N.J.Tax 542, 560-61 (Tax 1998), aff'd o.b., 19 N.J.Tax 46 (App.Div.2000). There, after quoting the definition of entrepreneurial incentive in The Appraisal of Real Estate, supra, at 360-61, I concluded that entrepreneurial profit or incentive should be included in a cost approach analysis although its impact “could be nullified by a later deduction for external obsolescence attributable to weak market conditions.” American Cyanamid Co., supra, at 561. Here neither appraiser made any deduction for external obsolescence, and both agreed that market demand existed for facilities such as the subject property. The only separate percentage for entrepreneurial incentive in the record is the 10% used by defendant’s appraiser. I find this percentage to be reasonable and consistent with the other Tax Court decisions discussed in American Cyanamid. Id. at 561.
I turn now to depreciation. Depreciation consists of three elements: physical deterioration, functional obsolescence, and ex- *442 temal obsolescence. In their respective cost approaches, both appraisers deducted depreciation relating to physical deterioration and functional obsolescence. The percentage depreciation attributable to physical deterioration used by defendant’s appraiser as to buildings is higher than that deducted by plaintiffs appraiser— 30% to 32% (and 37.5% to 42.5% for outbuildings) versus 24.8% to 29.4%. For site improvements, defendant’s appraiser used 40% to 45% and plaintiffs appraiser 30% to 50%.
I find the percentages used by defendant’s appraiser to be more reliable. As discussed earlier, plaintiffs appraiser used a replacement cost analysis. In determining the economic life of the improvements, the appraiser appears to have estimated the economic life for the actual subject improvements if reproduced, and not the economic life of the replacement facility which was the basis for his cost estimate. Curiously, in his depreciation calculations, the plaintiffs appraiser refers to reproduction cost and not replacement cost, but uses his replacement cost numbers. The appraiser then determined an effective age for the actual subject improvements and calculated his physical deterioration percentage by a comparison of the two ages. Thus, if economic life is fifty years and effective age is 12.4 years, the depreciation percentage would be 24.8%.
“[T]he analysis of depreciation must be internally consistent, using either reproduction cost or replacement cost as the cost basis throughout.” The Appraisal of Real Estate, supra, at 384. I conclude that the physical deterioration analysis by plaintiffs appraiser is not internally consistent, and reject it. I will apply the physical deterioration percentages determined by defendant’s appraiser.
With respect to functional obsolescence, plaintiffs appraiser deducted 10% and defendant’s appraiser 3%. I have previously discussed the deficiencies in the replacement cost analysis by plaintiffs appraiser. These deficiencies alone would warrant rejecting the appraiser’s functional obsolescence analysis. It also appears that his discussion of functional obsolescence relates to the actual subject building not the replacement facility he assumed *443 in his cost approach. The appraiser again has violated the requirement of consistency. Even in his discussion of the actual subject facility, the appraiser failed to consider the extensive improvements and upgrades to the heating, ventilating, and air conditioning system discussed above.
The functional obsolescence analysis by defendant’s appraiser is consistent with his reproduction cost analysis and gives consideration to those improvements and upgrades. I accept his functional obsolescence estimate of 3%.
As noted earlier, neither appraiser subtracted any amount for external obsolescence.
Based on the preceding analysis of the proofs presented by the parties, I conclude that: 1) for each year under appeal, the subject property can and should be valued by using the cost approach; and 2) for each year under appeal, defendant’s cost approach proofs, modified to reflect the errors I have discussed, are sufficient to overcome the presumption of validity that attaches to the assessment and establish the value of the subject property.
V.

Conclusion

I accept and concur with the conclusion of both appraisers that, as of each valuation date, a market existed for the subject property at its highest and best use as an industrial research and development facility utilizing the laboratories and pilot plants contained in the subject main building. Consequently, I do not rely on defendant’s cost approach because the subject property is or was a special purpose facility. See Ford Motor Co. v. Edison Tp., supra, 127 N.J. at 299-300, 604 A.2d 580 (suggesting that a court should be reluctant to use the cost approach except with respect to “special purpose” property). I rely on defendant’s cost approach because of the serious deficiencies in, and unreliability of, the sales comparison and income approaches presented by both appraisers, and the unreliability of the cost approach presented by plaintiffs appraiser.
*444 In deciding to rely on defendant’s cost approach, I recognize that, in an appraisal valuing another property owned by plaintiff, the Hazlet Creative Center, as of October 1, 1996, defendant’s appraiser relied on all three approaches to value and determined a land value substantially below his value for the subject land in .Union Beach. I am satisfied that the appraiser’s Hazlet valuation does not impeach the credibility of his cost approach valuation of the subject property because: 1) his Hazlet land value reflects his determination that approximately 40% of the land constituted wetlands and wetlands buffer areas; 2) the Hazlet facility contained approximately 74% of warehouse space, as compared to warehouse area in the subject Union Beach property of approximately 3%; and 3) the Hazlet facility did not contain laboratories and pilot plants similar to those at the subject property.
I also recognize that, in an appraisal of a Colgate-Palmolive research and development facility in Piscataway, New Jersey, defendant’s appraiser relied exclusively on the sales comparison approach. Plaintiff used this appraisal in cross-examination of the appraiser. The Colgate-Palmolive appraisal clearly was intended to provide an approximate value in order to facilitate settlement of a tax appeal with respect to that property. Contemporaneous correspondence from defendant’s appraiser explicitly stated that a full valuation appraisal would rely on a cost approach. Consequently, the appraiser’s reliance on the cost approach in valuing plaintiffs property is not inconsistent with his Colgate-Palmolive appraisal.
The cost approach generally is regarded as inapplicable, or at least not very reliable, in valuing older facilities. Here, however, the age of the subject property should not be measured from the original construction in 1967 because plaintiff has made significant improvements, upgrades, and expansions since 1967, continuing through 2001, and has kept the property well maintained. Even plaintiffs appraiser, in his somewhat confusing physical deterioration analysis, found a maximum average effective age for buildings of 14.7 years.
*445 The Appraisal of Real Estate states as follows concerning the use of the cost approach:
In any market, the value of a building can be related to its cost. The cost approach is particularly important when a lack of market activity limits the usefulness of the sales comparison approach and when the properties to be appraised — e.g., single-family residences — are not amenable to valuation by the income capitalization approach. Because cost and market value are usually more closely related when properties are new, the cost approach is important in estimating the market value of new or relatively new construction. The approach is especially persuasive when land value is well supported and the improvements are new or suffer only minor depreciation and, therefore, approximate the highest and best use of the land as though vacant. The cost approach can also be applied to older properties given adequate data to measure depreciation,
[The Appraisal of Real Estate, supra, at 353-54.]
I find that the criteria for use of the cost approach in the quoted language are satisfied here, even though the subject property is not new. My reasons are the following:
1) neither the sales comparison approach nor the income approach, as presented by plaintiff and defendant, is a useful and reliable indicator of the value of the subject property;
2) land value is well-supported;
3) because of the upgrades and improvements I have described and plaintiffs maintenance practices, the subject property only to a limited extent is classifiable as an older property, and
4) defendant’s appraiser had adequate data to measure depreciation — over 700 pages of building plans; detailed descriptions of expansions, upgrades, and improvements; an opportunity to inspect the facility; and an opportunity to review the deposition testimony of plaintiffs employees.
As suggested in the above-quoted language from The Appraisal of Real Estate, the cost approach is a market approach. This is stated more directly elsewhere in The Appraisal of Real Estate as follows: “The cost approach is based on the understanding that market participants relate value to cost.” Id. at 63. “The cost approach reflects market thinking because market participants relate value to cost.” Id. at 349. “The thesis of the cost approach is that the cost of new improvements plus an appropriate entrepreneurial profit or incentive minus depreciation plus the value of the land equals market value.” Id. at 352.
Defendant recalculated its cost approach valuation of the subject property for each year under appeal, taking into account the *446 modifications I determined were necessary as set forth above. The recalculation produced in the following values, including land:
1998- $28,038,724
1999- $28,535,451
2000- $29,712,586
2001- $31,994,784
2002- $32,013,906.
Plaintiff was afforded the opportunity to dispute all or any portion of the recalculation but did not do so. Consequently, I accept the recalculated cost approach values as correctly reflecting the required modifications. I note that these values, ranging from approximately $154 to $174 per square foot, are consistent with the cost incurred by plaintiff in 2002 for conversion of approximately 6200 square feet of the data center in the main building to laboratory space. This cost for interior construction work only, after excluding the costs of equipment and demolition, was approximately $152 per square foot.
As previously discussed, I rely almost totally on defendant’s cost approach as establishing the taxable value of the subject property for each of the years under appeal. The only other valuation analysis to which I give any weight is the income approach analysis by defendant’s appraiser for tax years 2001 and 2002. As modified in the discussion above, this approach produced values of $31,747,179 for 2001 and $33,258,954 for 2002, but, as stated above, I lack confidence in the overall reliability of the approach. I conclude, therefore, that the value of the subject property for each year under appeal is established by defendant’s recalculated cost approach.
The final step in my analysis is to determine the appropriate assessment under Chapter 123, N.J.S.A. 54:1-35a to 35c and N.J.S.A. 54:51A-6 (making the Chapter 123 ratio applicable in the Tax Court). The Chapter 123 ratios and the lower limits of the common level range for the years under appeal were as follows:
Year Ratio Lower Limit
1998 105.31 90.02
1999 106.59 90.60
2000 102.40 87.04
2001 95.38 81.07
2002 88.85 75.52 ’
*447 For each year, the ratio of the assessed value of the subject property ($23,261,600) to the property’s market value was below the applicable lower limit of the Chapter 123 common level range.
Paragraphs a, b, and c of N.J.S.A. 54:51A-6 set forth the procedures for applying Chapter 123. Paragraph a provides that, where the “ratio of the assessed valuation of the subject property to its true value ... falls below the lower limit of the common level range,” the appropriate procedure is to apply “the average ratio to the true value of the property except as hereinafter provided.” True value is equivalent to market value. See N.J.S.A. 54:1-35.3 (defining true value as “valuation at current market prices or values” for purposes of calculating the ratios used under Chapter 123). Paragraph a assumes that the average ratio is below 100%. Neither paragraph a nor either of paragraphs b and c expressly contemplates the situation, present here for tax years 1998, 1999, and 2000, where the average ratio exceeds 100%. When read together, however, the three paragraphs indicate that under no circumstances may a property be assessed at more than 100% of its true value. Consistent with this principle, the Tax Court, in Abe Schrader Corp. v. Secaucus, 8 N.J.Tax 390, 400-402 (Tax 1986), held that, when the Chapter 123 average ratio exceeds 100%, and the ratio of assessed value to true value of the property in issue is below the lower limit of the Chapter 123 ratio, the proper application of N.J.S.A. 54:51A-6 is to assess the property at 100% of its true value. I concur with that holding.
Based on the preceding analysis, I conclude that the assessments on the subject property should be increased for all years under appeal. As noted at the beginning of this opinion, defendant filed a counterclaim seeking an increase in assessed value for each year except 1999. Even in the absence of a counterclaim, an assessment may be increased pursuant to the application of Chapter 123. F.M.C. Stores Co. v. Morris Plains Bor., 100 N.J. 418, 427-28, 495 A.2d 1313 (1985); Campbell Soup Co. v. Camden, 16 N.J.Tax 219, 228-29 (Tax 1996).
*448 The proper assessment (rounded to the nearest $100) on the subject property for each year under appeal is as follows:
1998 — Land $ 1,749,300
Improvements - $26,289,400
Total - $28,038,700 (100% of market value)
1999 — Land $ 1,836,800
Improvements - $26,698,700
Total - $28,535,500 (100% of market value)
2000 — Land $ 1,924,200
Improvements - $27,788,400
Total - $29,712,600 (100% of market value)
2001 — Land $ 1,962,900
Improvements - $28,553,700
Total - $30,516,600 (95.38% of market value)
2002 — Land $ 1,920,000
Improvements - $26,524,400
Total - $28,444,400 (88.85% of market value).
Judgments will be entered in the foregoing amounts.

 This opinion was rendered as a bench opinion on May 3, 2004 and supplemented by a letter opinion on July 12 2004. In this version of the opinion, I have consolidated the bench and letter opinions, refined the bench opinion and amplified it to a limited extent. I have also condensed the bench opinion to a significant extent by deleting factual analyses having no general interest or applicability. The deletions are indicated in the text of the opinion.

 Chapter 12 of Title 18 of the New Jersey Administrative Code expired on July 21, 2003, but was in effect during the years under appeal.

 The cost amounts for 1998 and 1999 do not include the trended cost of the sensory testing center addition which, as discussed above, is excluded from value for these years.

 This item was described by defendant’s appraiser as relating to "costs incurred by either the general contractor or property owner for items associated with job management and supervision.”